# EXHIBIT 2

**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF OKLAHOMA**

| | |
|---|---|
| PHARMACEUTICAL CARE MANAGEMENT ASSOCIATION, | )<br>)<br>)<br>) |
| Plaintiff, | ) |
| v. | ) Civil Action No. CIV-19-977 J |
| GLEN MULREADY,<br>in his official capacity as<br>Insurance Commissioner of Oklahoma, | )<br>)<br>)<br>) |
| Defendants. | ) |

**DECLARATION OF ADAM STACY**

I, Adam Stacy, am over 18 years of age and hereby declare as follows:

1. I am the Vice President, Retail Contracting and Strategy for Express Scripts, Inc. ("Express Scripts"). Express Scripts is a pharmacy benefits manager ("PBM") and a member of the Pharmaceutical Care Management Association ("PCMA"). I submit this Declaration in support of PCMA's Motion for Preliminary Injunction. Except as otherwise indicated, all facts set forth in this Declaration are based on my personal knowledge. If I were called upon as a witness, I could and would competently testify to the facts set forth below on that basis.

**I.   Introduction**

2. As a PBM, Express Scripts manages pharmacy benefits for its clients – health plan sponsors – across the United States. Express Scripts' core PBM services and offerings include, among other things:

- the creation, administration and maintenance of nationwide networks of pharmacy providers;

1

- disease management program offerings for beneficiaries who suffer from complex, chronic, or rare diseases;
- real-time, electronic prescription claims processing (at the pharmacy counter) for health plan members to fill prescriptions and pay cost-shares according to their unique prescription drug benefit designs;
- customer service and communications to members regarding their prescription drug benefit; and
- a multitude of customized offerings that fit a specific plan sponsor and the needs of its membership.

3. My duties at Express Scripts include, among other things, oversight of Express Scripts' retail pharmacy contracts which govern the contractual relationships between Express Scripts and the over 60,000 pharmacies participating in Express Scripts' nationwide pharmacy provider networks.

4. Since last year, I have worked with others in my organization to plan for and ensure Express Scripts' compliance with the Oklahoma Patients' Right to Pharmacy Choice Act (the "Act"). After the State agreed to refrain from enforcing the Act during the pendency of this lawsuit, Express Scripts paused its compliance efforts in reliance on the State's promise not to enforce the law unless and until it is validated by the Court.

**II.     Express Scripts' PBM Services**

5. Express Scripts' PBM clients are health plan sponsors – employers, government entities, insurance companies, managed care organizations such as health maintenance organizations ("HMOs'), and third party administrators – with whom Express Scripts contracts to provide PBM services. Those clients include ERISA and Medicare Part D plan sponsors.

6. Express Scripts' PBM client contracts include numerous PBM services and provide for prescription drug pricing (which often includes negotiated pricing guarantees) to help clients manage drug spend, as well as creating obligations for Express Scripts to offer certain pharmacy

networks, which may be tailored to meet particularized client needs and demands of the health plan's membership.

7. Express Scripts serves more than 300,000 members who reside in Oklahoma. These members are participants in approximately 1,200 health plans sponsors that contract with Express Scripts for PBM services. The majority of these health plan sponsor clients are organized in, and/or maintain headquarters, outside of Oklahoma. These clients include ERISA plans, Medicare Advantage plans, and Medicare Part D plans, among others. In 2019, Express Scripts adjudicated approximately 5 million claims submitted by pharmacies located in Oklahoma.

8. As discussed above, one of Express Scripts' core PBM services is the creation and maintenance of pharmacy networks. Pharmacy networks are groups of pharmacies where members of health plan sponsors contracted with Express Scripts for PBM services can use their prescription drug benefits to fill prescriptions. Express Scripts contracts directly with pharmacies or via pharmacy services administrative organizations ("PSAOs") to create and manage these networks. These contracts set forth reimbursement rates, which the pharmacy agrees to accept in exchange for the benefit of dispensing prescription drugs to members of health plan sponsors contracted with Express Scripts for PBM services. Express Scripts manages multiple networks within Oklahoma, including both open networks and preferred networks. The availability of multiple network options is an important component of Express Scripts' network offerings, because multiple networks allow Express Scripts to offer health plan sponsors optionality in designing prescription drug benefits.

9. An "open" network provides members access to more pharmacies where they may fill prescriptions. Members whose prescription drug benefit includes a single tier open network have the same cost-sharing at any of the pharmacies within the network. Members whose prescription

drug benefit includes a preferred network or a preferred tier within their network generally pay a reduced cost-share when they select a preferred pharmacy as opposed to a pharmacy that is within the "open" network. Pharmacies in "preferred" networks agree to accept lower reimbursement rates in exchange for the benefit of having members directed by their health plan sponsors to fill their prescriptions at a preferred pharmacy. This strategy helps health plan sponsors control prescription drug costs and ultimately may help lower premiums for their members.

10.     In addition to retail pharmacy networks and services, another core PBM service is offering disease and benefit management for specialty drugs. Specialty drugs are generally prescribed for individuals with complex or chronic medical conditions, such as pulmonary hypertension and hemophilia. Specialty drugs often require additional patient education, adherence, and support beyond traditional dispensing activities, and typically come at a very high cost. Express Scripts creates specialty pharmacy offerings for its health plan sponsor clients and their members that provide high-quality, long-term savings, and better clinical outcomes through improved management. These offerings to health plan sponsors include plan design recommendations for specialty drugs, programs that are designed to support benefit management such as Express Scripts' SafeGuardRx programs, and dispensing arrangements with affiliated specialty pharmacies like Accredo that have broad product access and clinical disease management programs for their patients. For example, in 2018, health plan sponsors contracted with Express Scripts for specialty pharmacy services through Accredo and their members received the benefit of 3,000 hemophilia-specific patient and prescriber interventions to ensure patient safety, drug effectiveness and affordability. And, for members with pulmonary arterial hypertension, another clinical protocol at Accredo reduced gaps in care by nearly 5%.

### III.     Effects of the Act

A. **Renegotiation and Amendment of Existing Contracts**

11.     In order for Express Scripts to comply with the Act, it may need to update its pharmacy network contracts in Oklahoma to encompass new terms and conditions.  Express Scripts is currently contracted with approximately 926 retail pharmacies in Oklahoma.  It would also need to renegotiate and amend its contracts with any health plan sponsors that have members filling prescriptions in Oklahoma, which could happen if the plan sponsor has members that reside in Oklahoma, or even has members that travel to Oklahoma for work or leisure.

12.     The task of reviewing, renegotiating and amending these contracts is a cross-functional effort, involving Express Scripts' legal, pharmacy network, pricing and client account management teams.  It may entail the negotiation of hundreds of pharmacy contracts and health plan sponsor contracts.  Express Scripts estimates that for each of these contracts it would need to spend significant time reviewing, modeling and otherwise preparing for negotiations and drafting amended contract language.

13.     In Express Scripts' experience, pharmacy network and client contracting takes significant time and resources to finalize, even in ordinary times.  It is also burdensome for health plan sponsors to implement plan changes out of the regular enrollment cycle.

B. **Change in Reimbursement Methodology**

14.     The Act also seeks to regulate how PBMs reimburse pharmacies, specifically mandating that PBMs reimburse affiliated mail order and specialty pharmacies for both brand and generic prescriptions on a unit-by-unit basis to ensure that un-affiliated pharmacies are receiving the same reimbursements (or higher).  This provision of the Act may result in PBMs having to renegotiate and amend their PBM client agreements and/or pharmacy agreements to adjust pricing to align with this provision.

### C. Higher Pharmacy Costs

15. The Act harms Express Scripts' ability to negotiate favorable pricing with pharmacies because Express Scripts' current open and preferred networks satisfy the "Pharmacy Access Standards" without relying on mail order pharmacies to do so. The Act increases pharmacy leverage to negotiate prices that would serve to increase the cost of healthcare by making it more difficult for PBMs to design networks that include a mail order component, which is typical and desired by many health plan sponsors and members in today's lifestyle.

16. The Act also harms Express Scripts' ability to negotiate favorable pricing with pharmacies because it prevents pharmacies from being able to compete for preferred network status. The effect of this will be to increase costs to health plan sponsors contracted with Express Scripts for PBM services.

### D. Limitation on Specialty Pharmacy Offerings

17. The Act forces Express Scripts to either reimburse retail pharmacies in its network the same price as it is paying specialty pharmacies for specialty medications (despite the fact that the retail pharmacies typically do not offer the same disease management and support services that specialty providers provide) or create a new separate specialty network. However, the Act also mandates the same access standards as retail without the use of mail order. This makes it nearly impossible to create a compliant specialty-only network, because many specialty pharmacies are mail-order only.

### E. Cost Savings Tools are Reduced

18. The Act prohibits Express Scripts from monitoring pharmacy claims and reducing claim reimbursements post-processing in certain circumstances, such as in connection with

pharmacy quality and performance incentives and pharmacy submission errors. These savings are often passed on to the client as a cost-containment tool and will be eliminated under the Act.

19.     The Act also prevents Express Scripts from recouping the costs of the services it offers to the pharmacies in its network, such as charging per-claim transaction fees that help support the costs of maintaining Express Scripts' state-of-the-art, real-time claims adjudication platform.

    **F.**     **Limitation on PBMs to Control Quality in its Specialty Pharmacy Offerings**

20.     The Act harms Express Scripts' ability to monitor and set standards for pharmacy network quality. This is particularly harmful with respect to prescriptions for specialty medications. Reimbursements for specialty drugs are generally higher for these high-touch medications because they reflect the significant ancillary services that should be offered by those pharmacies in addition to dispensing the drug. The "Any Willing Provider" and "Affiliated Pharmacy Match Requirement" forces PBMs to either reimburse retail pharmacies dispensing specialty drugs at the same rate (but without receiving the same ancillary services) or recalibrate its reimbursement model for specialty drugs altogether.

21.     Moreover, the Act will limit Express Scripts' ability to help its health plan sponsor clients encourage members to have their specialty prescriptions filled at an affiliated or credentialed specialty pharmacy as opposed to a retail pharmacy that does not provide the important ancillary services necessary to maintain the appropriate quality of care. Since the Act and the Emergency Rule require Express Scripts to include "any willing specialty pharmacy" in its networks, it can no longer work with health plan sponsors to encourage members to use affiliated or credentialed specialty pharmacies that have the requisite experience to manage these serious conditions.

### G. Increased Administrative Burden

22. The Act imposes a significant administrative burden on Express Scripts, especially at the outset, because Express Scripts will be required to review, renegotiate and amend its pharmacy networks and PBM client contracts to come into compliance with the law. As described above, this will require hours of labor and weeks or months of ongoing negotiations with pharmacies and health plan sponsors.

23. Moreover, given the nationwide-nature of the prescription drug benefit market, implementing a different benefit model for Oklahoma only will impose a significant administrative burden and cost on Express Scripts and its health plan sponsor clients while eliminating the ability for health plan sponsors to have consistent, uniform nationwide prescription drug benefits for their members.

### H. Financial Harm

24. The Act increases the costs of providing core PBM services, both directly by shifting the costs to Express Scripts and indirectly by eliminating the PBM's ability to contain costs for its health plan sponsor clients. These indirect costs will necessarily be borne by Express Scripts' clients and their members, as described above. Many of the direct costs, however, will be borne by Express Scripts itself. For example, as described above, Express Scripts monitors pharmacy claims and may reduce certain claim reimbursements post-processing for pharmacy claims submission errors. The Act's "Claims Processing Restrictions" prohibit Express Scripts from adjusting pharmacy reimbursements downward (unless the pharmacy is found to have engaged in fraud or an error is identified through an audit), and as a result Express Scripts will be forced to bear those unwarranted costs.

25.    Express Scripts will also bear the cost of the elimination of service fees, such as the per-claim transaction fees described above, pursuant to the "Service Fee Prohibition" under the Act, which Express Scripts estimates is approximately $35,000 per month.

26.    Express Scripts will also bear the burden and cost of revising, drafting and printing new member communications for plan sponsors and members impacted by the Act, which will be significant.

## IV.    The Effects of the Act are Exacerbated given the COVID-19 Pandemic

27.    The effects of the Act will be exacerbated by the fact that the State now seeks to enforce it during the coronavirus pandemic, which spread to the United States several months ago and has since caused states, including Oklahoma, to close non-essential businesses and advise people to stay home. The pandemic has also caused worldwide economic disruption, including to the health care market, which is unlikely to be resolved in the next several months. Express Scripts has been on the front lines of responding to the COVID-19 crisis, and has dedicated significant resources to tracking ever-changing state and federal legislation and regulation, enacting internal and pharmacy policy changes, monitoring drug shortages and communicating with health plan sponsor clients and their members about changes to the plan benefits in response to the crisis, and providing critical prescription access programs for the newly uninsured. This work continues and will continue at least until the COVID-19 crisis has resolved.

28.    Like most American businesses during the COVID-19 crisis, Express Scripts' workforce has been relegated to working without the usual social supports of childcare, elder care, and school to allow for traditional working days. Express Scripts has workers on medical or family medical leave as a result of the virus and has also seen a decrease in available working hours since the pandemic came to the United States.

29. If the State were to enforce the Act at any time in the near future, it would unnecessarily burden Express Scripts' already stressed workforce. The same teams that are working during these challenging times to respond to COVID-19 would have the significant additional work of compliance with the Act added to their plates. Express Scripts' efforts to maintain resilient pharmacy networks that can service plan members while maintaining required social distancing and other protective measures would be undermined and do not advance the public interest.

30. Express Scripts supports PCMA bringing this action.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on May 13, 2020

_____
**Adam Stacy, Vice President, Retail Contracting and Strategy**