# EXHIBIT 3

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF OKLAHOMA**

_____
                                                      )
PHARMACEUTICAL CARE MANAGEMENT )
ASSOCIATION,                                    )
                                                      )
                                    Plaintiff,    )
                                                      )
v.                                                    )          Civil Action No. CIV-19-977-J
                                                      )
GLEN MULREADY,                            )
in his official capacity as                    )
Insurance Commissioner of Oklahoma,  )
                                                      )
                                                      )
                                    Defendants.  )
_____)

## DECLARATION OF BRIAN CORREIA

I, Brian Correia, am over 18 years of age and hereby declare as follows:

1.  I am a Senior Vice President, Network Services, for CVS Caremark ("CVS Caremark").  CVS Caremark is a pharmacy benefits manager ("PBM") subject to the Patients' Right to Pharmacy Choice Act (the "Act") and a member of the Pharmaceutical Care Management Association ("PCMA").  I submit this Declaration in support of PCMA's Motion for Preliminary Injunction.  Except as otherwise indicated, all facts set forth in this Declaration are based on my personal knowledge and information and belief based on information provided to me by others within my organization.  If I were called upon as a witness, I could and would competently testify to the facts set forth below on that basis.

1

I.    Introduction

2.   As a PBM, CVS Caremark administers prescription drug benefits on behalf of health plans across the United States.  Health plans engage a PBM like CVS Caremark for a number of reasons, including but not limited to the following:  First, the administration of prescription drug benefits is administratively complex, and health plans benefit from PBMs' expertise in that area. Second, health plans rely on PBMs to help minimize prescription drug costs for them and their members.  Third, PBMs contract with pharmacies to create pharmacy networks composed of high quality pharmacies to service health plan members.

3.   CVS Caremark accomplishes the above by providing core pharmacy benefit management services including but not limited to, (a) contracting, administration and maintenance of pharmacy networks, including retail pharmacies, mail order pharmacies and/or specialty pharmacies, on behalf of its clients; (b) processing prescription drug claims for health plan members; (c) clinical services, including utilization and disease management programs; and (c) customer service for health plan members (collectively, "PBM services").  As a PBM, CVS Caremark is not a health plan and does not itself provide prescription drug coverage to its clients' members.  Caremark's goal is to positively impact health care and individual health by innovating and working alongside its clients.

4.   CVS Caremark is owned by CVS Health, which also owns CVS retail pharmacies ("CVS Retail").  CVS Caremark itself owns specialty and mail order pharmacies.

5.   My duties at CVS Caremark include executive oversight of the Pharmacy Network Services department.  Within my purview are network credentialing/certification for new and currently enrolled pharmacies, network pricing and implementations, network development (including pharmacy contracting, communications, account management, geo access and directory analysis), client-facing retail strategy, including for Medicare Part D plans,  pharmacy audit, network performance and other program initiatives, network management (provider and network enrollment), and industry relations and network business applications.

6.   In the past two months, my work has been focused on CVS Caremark's response to the COVID-19 crisis.  In particular, I have been overseeing communications with pharmacies in our network and ensuring that they are prepared to address the COVID-19 issues, as described further below.

7.   Part of my role at CVS Caremark is ensuring that networks comply with new laws.  After the State agreed to refrain from enforcing the Act during the pendency of this lawsuit, CVS Caremark paused its assessment of the impact on ERISA and Part D plans in reliance on the State's promise not to enforce the law unless and until it is validated by the Court.  I am aware of the Act's harmful effects on CVS Caremark, its customer health plans, and the individual members of those health plans (prescription drug consumers) who fill prescriptions in Oklahoma.

3

II.     <u>CVS Caremark's Pharmacy Benefit Management Services</u>

8.   CVS Caremark's customers are primarily providers of health insurance which serve, but are not limited to, self-funded plans administered by employers for their employees' benefit, and fully-insured plans that offer non-ERISA, ERISA, and Medicare Part D plans.

9.   CVS Caremark's customers engage CVS Caremark for its PBM Services, which are designed to help decrease the cost of prescription drug coverage, ensure a certain level of quality service for health plan beneficiaries, and reduce the significant burden associated with offering consistent and effective pharmacy benefit management. For this reason, nearly all health plans in the United States contract with a PBM such as CVS Caremark to manage their prescription drug benefits.

A.     <u>CVS Caremark's Customer Contracts</u>

10. The market for PBM services is highly competitive.  The market includes PBMs that compete for business nationwide as well as those that compete regionally. CVS Caremark competes for customers throughout the United States.

11. CVS Caremark secures customer contracts primarily through a competitive bidding process in which PBMs submit bids in response to requests for proposals for a prospective customer.  Such bids address financial and PBM service terms.  As a result, CVS Caremark invests significant resources to develop its core PBM services to secure

that business, which rely on unique, proprietary strategies, including pharmacy network strategies.

12. CVS Caremark's customer contracts include various guarantees related to drug pricing and PBM service, including obligations for CVS Caremark to offer certain pharmacy networks and pricing arrangements.  Contracting with customers is done on a national or regional basis, not on a state-by-state basis.  Therefore, a customer contract would include the same provisions for prescription drug benefits offered in Oklahoma and elsewhere.

13. CVS Caremark serves more than 1.3 million health plan members in Oklahoma.  In 2019, CVS Caremark processed approximately 17 million claims submitted by pharmacies located in Oklahoma.

B.   CVS Caremark's Core PBM Services

1.   *Pharmacy Networks*

14. One of CVS Caremark's core PBM services is the creation, administration and maintenance of pharmacy networks on behalf of its customer health plans.  Pharmacy networks are groups of pharmacies where CVS Caremark's customers' beneficiaries can use their prescription drug benefits to fill prescriptions.  CVS Caremark contracts directly with pharmacies or via pharmacy services administrative organizations ("PSAOs") to create and manage these networks.  These contracts set forth reimbursement rates, which the pharmacy agrees to accept in exchange for dispensing prescription drugs to members

of the health plan (CVS Caremark's customer).  To ensure that the client's members receive high-quality services, CVS Caremark requires network pharmacies to contractually commit to meet various safety and performance standards, and CVS Caremark monitors and audits the pharmacies to ensure that they are compliant.  CVS Caremark manages multiple networks within Oklahoma, including both open networks and preferred (narrow or exclusive) networks.  The availability of multiple network options is an important component of CVS Caremark's business model, because multiple networks allow CVS Caremark to offer its customer health plans the choice of varied prescription drug benefit designs.

15. The open network provides members with more pharmacies at which they may fill prescriptions.   Members whose prescription drug benefit includes an open network have the same cost-sharing at any of the pharmacies within the network.  Members whose prescription drug benefit includes a preferred, narrow or restricted network may pay a lower co-pay when they select a preferred pharmacy as opposed to a pharmacy that is within the traditional network.  Pharmacies in some preferred networks agree to accept lower reimbursement rates, which saves clients money.  This strategy helps control prescription drug costs and ultimately lower premiums for members of CVS Caremark's clients.

16. CVS Caremark offers a wide range of plan benefit designs to its clients, ranging from narrow and exclusive networks including only CVS retail and mail

pharmacies and specialty pharmacy networks including only CVS Caremark specialty pharmacies to wide networks including CVS retail pharmacies as well as other pharmacies.  One of its most popular plan benefit designs is called "maintenance choice." This benefit allows members to fill all of their maintenance medications at CVS retail or CVS Caremark mail order pharmacies at a relatively low cost compared to other pharmacies.  This plan is cost-effective for both health plan customers and their members:  our data shows that maintenance choice networks save health plans and members in prescription drug costs.  The maintenance choice plans also result in better adherence to prescription drug treatment.

17. The networks are critical for CVS Caremark's customer health plans to design the pharmacy benefit that is right for their beneficiaries.  CVS Caremark's customers drive their own pharmacy networking decisions, including whether they would like a preferred network and which pharmacies they would like in the preferred network. These decisions can be based on a number of factors, such as convenience, quality and cost.  The network models are generally applied across plan members regardless of their state of residence or where they will fill their prescriptions.

18. Pharmacy network contracts typically include fees that network pharmacies must pay to CVS Caremark for the PBM's network pharmacy services.  These services include enrollment in the network; use of the PBM's claims adjudication system;

pharmacy compliance and claims information quality programs; claim remittance; and audit programs.

19. Although CVS Caremark and CVS retail pharmacies share a common owner, the negotiation between the PBM and the pharmacy is done at arms-length.

2. *Disease Management and Specialty Pharmacy*

20. In addition to its regular retail pharmacy networks and services, another core PBM service is disease management programs. These are frequently available through CVS Caremark's specialty pharmacy offerings. Specialty drugs are generally prescribed for an individual with a complex or chronic medical condition, or a very rare disease. These drugs require specialized handling, particular methods of administration (e.g., injectables, infusions), additional patient education, adherence and support beyond traditional dispensing activities, and typically come at a very high monthly cost. Based on the client's choice, CVS Caremark's specialty network for the client can consist exclusively of pharmacies owned by subsidiaries of CVS Caremark that are engaged in the business of providing specialty-pharmacy services, or also other pharmacies that have no affiliation to CVS Caremark whatsoever. Pharmacies participating in CVS Caremark's specialty networks are subject to additional terms and conditions beyond the standard terms and conditions for participation in CVS Caremark's retail network, in recognition of the qualitative difference between traditional retail pharmacy and specialty

pharmacy medications. While CVS Caremark does contract with brick-and-mortar specialty pharmacies, there are no such pharmacies located in Oklahoma.

### 3. Prescription Drug Claim Pricing and Processing

21. Another of CVS Caremark's core PBM services is prescription drug claim processing for health plan members.  This service involves the development and maintenance of proprietary drug pricing formulas and technology to support prescription reimbursement requests and fulfillment, as well as a team dedicated to handling post-processing appeals and inquiries.  CVS Caremark determines reimbursement amounts in accordance with its client contracts.

## III.    CVS Caremark's Response to the COVID-19 Crisis

22. CVS Caremark, its health plan clients, its mail and specialty pharmacies and CVS Retail pharmacies have been on the front lines in responding to the COVID-19 pandemic in Oklahoma.  CVS Caremark has taken numerous steps to help ensure that its clients' members have access to prescription drugs over the course of the pandemic.

23. For example, CVS Caremark has been monitoring the global pharmaceutical manufacturing environment and working with suppliers to help ensure we can continue filling prescriptions for our pharmacy patients and clients' plan members.  We are also actively managing our supply to help ensure our ability to continue to fill prescriptions in our retail, mail and specialty pharmacies.  We have also consulted with our clients and have implemented plan design changes on their behalf, including for example adding

quantity limits to hydroxychloroquine, chloroquine, Kaletra, and Albuterol to prevent stockpiling and potential shortages.

24. CVS Caremark has also taken steps to ensure that members of the health plans it serves can access their prescriptions while maintaining social distancing and have options available to them when it comes to filling prescriptions.  For example, with client consent, CVS Caremark relaxed restrictions on early refills on 30 day supplies of maintenance medications, ensuring that members did not have to leave the house multiple times to pick up prescriptions.  A significant number of CVS Caremark clients opted to utilize this functionality.  With client consent, CVS Caremark also extended certain clinical prior authorizations records, set to expire between March 23, 2020 and June 30, 2020, by 90 days.  CVS Caremark also relaxed network requirements regarding member signatures, so that members may pick up a prescription without touching pharmacy tablets or writing implements, and suspended most pharmacy audits.  CVS Pharmacy waived charges for home delivery of eligible maintenance and acute prescription medications during this time.  Home delivery continues to be provided at no extra charge from Caremark Mail Service Pharmacy and Caremark Specialty.

25. CVS Caremark made these efforts over the past approximately two months while facing the same challenges presented to all American businesses at this time.  Since mid-March, CVS Caremark's workforce, including the teams tasked with developing and implementing the above measures, has been operating remotely.  CVS Caremark had to

increase the capacity of its IT infrastructure to support this additional work from home, which requires ongoing maintenance for as long as this increased capacity is demanded.

26. Those employees are working under challenging conditions.  They must juggle personal equipment and internet to allow for remote work, learn to use new collaboration platforms to work with their teams, and deal with their team's different or flexible schedules.  Many of these employees have had to address childcare needs and/or find themselves now responsible for home-school and/or caring for elderly or otherwise needy loved ones during traditional work hours.

27.  CVS Caremark's clients, health plans including those based in Oklahoma, are also facing the remote workplace challenges described above.  In many instances, these challenges are overseen by the customer's Human Resource department, which is involved in plan benefit design and negotiation.  CVS Caremark has seen its client activity focused on dealing with issues relating to COVID-19, and not benefit management activity other than in cases where they are requesting contractual accommodations (e.g. extension on payment terms – which CVS Caremark has accommodated in a number of cases).  To that end, it will be difficult to engage clients for network changes when dealing with already strained client HR teams.  Also, many clients have realized a negative impact to their core business, so adding additional benefit cost at this time would likely further frustrate these clients' ability to financially recover from this crisis.

IV.    <u>Effects of the Act</u>

    A.    <u>Implementation of the Act During the COVID-19 Crisis Will Immediately and Irreparably Harm CVS Caremark</u>

28.   As described above, CVS Caremark has been working hard to respond to the COVID-19 crisis.  This work continues.  If the Act were to be implemented during the COVID-19 crisis, the administrative burden of compliance would severely impact CVS Caremark and its customer health plans.

29.   In order for CVS Caremark to comply with the Network Restrictions, it would need to eliminate its "maintenance choice" networks, because that network may no longer be restricted to CVS pharmacies only.  It will also need to renegotiate other aspects of its retail pharmacy network, including possibly allowing retail pharmacies to dispense specialty drugs and allow some non-affiliated specialty pharmacies into its network.  It would also need to update and renegotiate its contracts with any health plans that have members filling prescriptions in Oklahoma, including out of state plans and plans with beneficiaries in multiple states.  The renegotiated contracts will reflect the elimination of the maintenance choice benefit and other changes to its network and specialty pharmacy offerings.

30. The task of renegotiating these contracts impacts a number of areas within the organization, including CVS Caremark's pharmacy network contracting, operations, and client engagement teams.  The amount of time spent in contracting will be significant.  For example, some employers who contract with CVS Caremark have bargained with

employee unions for the specific terms and conditions of their prescription drug benefits. As a result, those employers may need to re-open bargaining with the union which would likely impede progress on the negotiation.

31. In CVS Caremark's experience, network contracting involves a significant amount of time effort on the part of Caremark, clients and pharmacies in ordinary times. But this is an extraordinary time, as the CVS Caremark teams who would need to do this work and all of the contractual counter-parties are consumed with responding to COVID-19 – and expect to be for the foreseeable future.

32. For CVS Caremark to comply with the Affiliated Pharmacy Match Requirement, it will need to change its reimbursement analysis for both brand name and generic prescriptions for its owned pharmacies on a unit-by-unit basis to ensure that un-affiliated pharmacies are receiving the same reimbursements (or higher).  CVS Caremark may need to change client agreements including contract guarantees to adjust guarantees to align with this provision. This work would involve CVS Caremark's pricing analytics, finance and operations teams.  These are the same teams that are focused on dealing with impacts of the COVID-19 crisis on members and pharmacies.

     B.    <u>The Act Will Harm CVS Caremark by Limiting CVS Caremark's Ability to Help Clients Minimize Drug Spend and Offer Varied and Nationally Uniform Benefit Design</u>

33. Even setting aside the administrative burden of implementation during a public health crisis, the Act will irreparably harm CVS Caremark whenever it goes into effect

against CVS Caremark's ERISA and Part D customers.  The provisions of the Act operate together to change CVS Caremark's core PBM services by limiting its ability to offer network options to its clients and interfering with CVS Caremark's mechanisms for ensuring that its networks provide consistent high quality pharmacy services to its customer health plans' members.  This damage to CVS Caremark's core PBM services also harms the national uniformity of prescription drug benefits offered by CVS Caremark's customers and administered by CVS Caremark.

> C.     <u>The Act Restricts CVS Caremark's Ability to Minimize Prescription Drug Costs and Offer Varied Benefit Design</u>

34. When read together, numerous provisions of the Act operate to harm CVS Caremark's ability to perform its core functions and diminish the value of CVS Caremark's services to its customer health plans.  The Act undoes the mechanism by which CVS can offer pharmacies enhanced customer volume in exchange for lower prices and higher service quality by requiring CVS Caremark to meet retail network access standards and open its narrow or "preferred" networks to any willing pharmacy, and prohibiting CVS Caremark from driving volume to preferred and affiliated pharmacies using beneficiary incentives or restrictions.

35. The Act makes it more difficult for PBMs to design networks that rely on mail order. Because CVS Caremark is restricted from using mail-order pharmacies to meet standards, and cannot require health plan members to use CVS Retail pharmacies, it will no longer be able to offer some of its networks to its customers.

36. The Act further impairs CVS's ability to offer increased volume to preferred or affiliated pharmacies in exchange for favorable pricing because it prohibits CVS from directing health plan members to any particular pharmacy. In particular, the combination of provisions on beneficiary direction and the other network restrictions will prevent CVS Caremark from offering its maintenance choice networks in their current form to its customers with members in Oklahoma.

37. The prohibition against service fees will also increase the cost of care to CVS Caremark's customers, as it prevents CVS Caremark from recouping the costs of the services it offers to the pharmacies in its network. At least some of those increased costs will be borne by CVS's customers, and are likely to be passed to their beneficiaries through increased premiums or cost-sharing.

D.      The Act Interferes with CVS Caremark's Ability to Control the Quality of its Networks

38. The Act harms CVS Caremark's ability to monitor and set standards for pharmacy network quality. This is particularly harmful with respect to prescriptions for specialty drugs, because CVS Caremark and its customers typically design plan benefits to limit specialty prescription dispensing to highly qualified and experienced pharmacies that achieve better clinical outcomes through improved total management of the disease states that demand specialty drugs, such as clinical programming and care management.

39. The Beneficiary Direction Prohibitions will limit CVS Caremark's ability to design benefits in a manner that encourages members with specialty prescriptions to fill

15

those prescriptions at a specialty pharmacy as opposed to any retail pharmacy stocking the drugs. Additionally, an Oklahoma law pre-dating the Act prohibits PBMs from requiring specialty pharmacy accreditation, making it difficult to demand specific standards for specialty services provided by retail pharmacies. Ok. Stat. Ann. §59-360. Since the Act and the Emergency Rule may require CVS Caremark to include any willing specialty pharmacy in its networks, it can no longer incentivize health plan members to use specialty pharmacies that are experienced in providing the benefit of integrated disease state management.

40. Other provisions in the Act also interfere with the quality of all of CVS Caremark's networks.  For example, the Act's prohibition on denying, limiting or terminating a pharmacy from a network because it employs a pharmacist on probation with the Board of Pharmacy limits CVS's ability to control the quality of services in the network.

41.  As a result of these restrictions, CVS Caremark loses control over the quality of care provided by its pharmacy network, which could threaten its ability to administer a quality network, and will in some cases render the pharmacy networks inconsistent with quality assurances included in CVS Caremark's customer contracts.

E.     The Act Harms CVS Caremark by Limiting its Ability to Serve its Customers with Innovative Plan Design, Lower Prices, and Nationally Uniform Benefits

42. Health plans engage CVS Caremark to use methods to help minimize drug spend, develop options for varied plan design, and administer their members' benefits nationwide.  The Act significantly limits CVS Caremark's effectiveness in all of these services by eliminating many of its existing strategies.

43. Health plans engage CVS Caremark to administer benefits on a national scale. The Act interferes with national uniformity of the prescription drug benefits that CVS Caremark administers for its health plan customers.  Under the Act, a health plan with members in Oklahoma and other states will likely need to employ multiple inconsistent pharmacy networks.  In addition, members traveling to Oklahoma from other states will see a change in their prescription drug benefits when they cross the Oklahoma border, as that member will no longer be able to access preferred pricing at the same preferred network as they would otherwise have access to.

F.     The Act Imposes Significant Administrative Burden on CVS Caremark

44. The Act imposes a significant administrative burden on CVS Caremark, especially at the outset, because CVS Caremark will be required to renegotiate its pharmacy networks and customer contracts to come into compliance with the law.  As described above, this requires hours of labor and weeks or months of ongoing negotiations with health plans and pharmacies.

45. Moreover, given the national nature of the prescription drug benefit market, administering a different benefit model for Oklahoma only will impose a significant administrative burden on CVS Caremark and its customers.

G.      The Act Will Harm CVS Caremark Financially

46.   The Act increases the costs of providing core PBM services, both directly by shifting the costs to CVS Caremark and indirectly by eliminating the PBM's cost containment tools.  Some of these indirect costs will necessarily be borne by CVS Caremark customers and their beneficiaries as described above.  Many of the direct costs, however, will be borne by CVS Caremark itself.

47. CVS Caremark will bear the cost of the elimination of service fees, which CVS Caremark estimates is $200,000 per month.

48. CVS Caremark will also bear the cost of re-printing all member communications for members who will fill prescriptions in Oklahoma, which is estimated to be at significant cost**.**

49. CVS Caremark will also be financially harmed by the provisions of the Act that require PBMs to refrain from driving business to affiliated pharmacies, because it owns multiple specialty and mail order pharmacies.

V.    The Act will Harm CVS Caremark's Customers and their Members

50. The Act's impediments to CVS Caremark's services will burden CVS Caremark's customer health plans and their members.  The cost of providing prescription

18

drug benefits to Oklahoma residents will increase due to the provisions in the law, and CVS Caremark's customers will likely bear at least some of those increases.  In addition, health plan members with cost-sharing obligations will see their out-of-pocket spend at the counter increase immediately after the networks are renegotiated for the reasons described above.

51. The Act is also likely to cause consumer confusion.  Plan members will likely need to be reissued benefit cards, and even after that may have a difficult time knowing where best to fill certain prescriptions.

52. The members will also be harmed by any reduction in pharmacy network quality.  This is particularly so for members who need specialty drugs, who may now obtain those drugs from pharmacies that are less qualified to offer disease state management, and the health plans that cover them.

53. CVS Caremark supports PCMA's bringing this action on its behalf.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on May 13, 2020

_____
Brian Correia

20