# EXHIBIT 4

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF OKLAHOMA**

| | |
|---|---|
| PHARMACEUTICAL CARE MANAGEMENT ASSOCIATION, | ) ) ) ) |
| Plaintiff, | ) ) |
| v. | ) ) |
| GLEN MULREADY, in his official capacity as Insurance Commissioner of Oklahoma, | ) ) ) ) ) ) |
| Defendants. | ) |

Civil Action No. CIV-19-977-J

## DECLARATION OF MARCI CONLIN

I, Marci Conlin, am over 18 years of age and hereby declare as follows:

1. I am the Assistant Vice President of Pharmacy Network Management for Prime Therapeutics LLC ("Prime"). Prime is a pharmacy benefits manager ("PBM") subject to the Patients' Right to Pharmacy Choice Act (the "Act") and a member of the Pharmaceutical Care Management Association ("PCMA"). I submit this Declaration in support of PCMA's Motion for Preliminary Injunction. Except as otherwise indicated, all facts set forth in this Declaration are based on my personal knowledge. If I were called upon as a witness, I could and would competently testify to the facts set forth below on that basis.

I.      Introduction

2.  As a PBM, Prime administers prescription drug benefits on behalf of health plans across the United States. Health plans engage a PBM like Prime for several reasons. First, the administration of prescription drug benefits is administratively complex, and health plans benefit from PBMs' expertise in that area. Second, health plans rely on PBMs to put downward pressure on the price of prescription drugs, so that costs stay lower for both health plans and their members. Third, PBMs offer services that help to promote the delivery of high quality care to plan members such as assuring access to providers who can explain the effects of medications, how they should be taken and the importance of adherence.

3.  Prime accomplishes the above by providing core pharmacy benefit management services including but not limited to, (a) contracting for and administering pharmacy networks on behalf of its clients, health plans; (b) processing prescription drug claims for health plan members; (c) formulary management; (d) clinical services such as disease management programs; and (e) customer service for health plan members (collectively, "PBM services").

4.  My duties at Prime include oversight of pharmacy network management which includes but is not limited to: engaging with Prime's clients to identify the pharmacies selected to participate in a preferred network tier to ensure members have adequate access to pharmacies; overseeing negotiation of pharmacy agreements to ensure that

members are receiving the best value for services; and monitoring pharmacy performance through quality-based network and Medicare pharmacy performance programs.

5. In the past two months, my work has been focused on Prime's response to the COVID-19 crisis. In particular, I have established daily and weekly processes to monitor pharmacies' capabilities, hours of operation, inventory of drugs, and to monitor national drug shortages, along with reviewing each state and federal emergency order to revise processing procedures to ensure compliance. I also am actively working with our health plans and pharmacies to remove barriers for pharmacies to service their customers and support members during these weeks of staying at home and social distancing.

6. After the State agreed to refrain from enforcing the Act during the pendency of this lawsuit, Prime put on hold compliance efforts that would have had serious impacts on network operations in reliance on the State's promise not to enforce the law unless and until it is validated by the Court. Because I worked on Prime's compliance efforts early on, I am aware of the Act's harmful effects on Prime, its customer health plans, and the individual members of those health plans (prescription drug consumers) who fill prescriptions in Oklahoma.

II.   Prime's Pharmacy Benefit Management Services

7. Prime's customers are primarily providers of health insurance which serve, but are not limited to, self-funded plans administered by employers for their employees' benefit, and fully-insured plans that offer non-ERISA, ERISA, and Medicare Part D plans.

8. Prime's customers engage Prime for its PBM Services, which decrease the cost of prescription drug coverage, ensure a certain level of quality service for health plan beneficiaries, and reduce the significant burden associated with offering consistent and effective pharmacy benefit management.  For this reason, nearly all health plans in the United States use Prime or another PBM to manage their prescription drug benefits.

A.  Prime's Customer Contracts

9. Prime secures customer contracts primarily through a competitive bidding process in which PBMs submit bids in response to requests for proposals for a prospective customer.  Such bids address financial and PBM service terms.  As a result, Prime invests significant resources to develop its core PBM services to secure that business, which rely on unique, proprietary strategies, including pharmacy network strategies.

10. Prime's customer contracts include various guarantees related to drug pricing and PBM services, including obligations for Prime to effectively administer pharmacy networks.

11. Under Prime's business model, Prime charges health plan customers the same amount Prime reimburses a pharmacy for a particular drug, and health plan customers pay Prime a flat fee for the services it provides.  Therefore, usually health plan customers will bear any increase in prescription drug reimbursements.

12. Prime serves approximately 640,000 plan members in Oklahoma.  In 2019, Prime processed approximately 8,543,042 claims for Oklahoma-based beneficiaries.

B.  Prime's Core PBM Services

1.  *Pharmacy Networks*

13. One of Prime's core PBM services is the administration of pharmacy networks on behalf of its customer health plans. Pharmacy networks are groups of pharmacies where Prime's customers' beneficiaries can use their prescription drug benefits to fill prescriptions. Prime contracts directly with pharmacies or via pharmacy services administrative organizations ("PSAOs") to manage these networks. These contracts include exhibits that set forth reimbursement rates, which the pharmacy agrees to accept in exchange for dispensing prescription drugs to members of the health plan (Prime's customer). Prime manages multiple networks within Oklahoma, including both open networks and preferred networks. The availability of multiple network options is an important component of Prime's business model, because multiple networks allow Prime to offer its customer health plans varied prescription drug benefit designs.

14. The open network provides members with more pharmacies at which they may fill prescriptions. Members whose prescription drug benefit includes a single tier open network have the same cost-sharing at any of the pharmacies within the network. Members whose prescription drug benefit includes a preferred network or a preferred tier within their network save when they select a preferred pharmacy as opposed to a pharmacy that is within the traditional network. Pharmacies in the preferred network tier agree to accept lower reimbursement rates in exchange for limitation on the number of preferred pharmacies and prescription benefit design which includes financial incentives

5

for members to fill their prescriptions with a preferred pharmacy.  A preferred network is typically contractually limited to a set number of retail pharmacy chains and/or PSAOs, which guarantees each of those pharmacies substantial prescription volume.  This strategy helps control prescription drug costs resulting in lower premiums for members of Prime's clients.

15. The networks are critical for Prime's customer health plans to design the pharmacy benefit that is right for their beneficiaries.  The open network offers beneficiaries more options for pharmacies at which they can fill their prescriptions, with the cost of that convenience reflected in the price that the health plan and beneficiaries pay for the drugs.  The preferred network allows plans to offer their members more affordable prescription coverage, because the pharmacies in the preferred network offer lower prices in exchange for more volume.  Both network models allow Prime to offer its customers, and the plans to offer their beneficiaries, a certain level of service and quality of care.  The network models are generally applied across plan members regardless of their state of residence or where they will fill their prescriptions.

> 2. *Disease Management and Specialty Pharmacy*

16. In addition to its regular retail pharmacy networks and services, another core PBM service is disease management programs.  These are frequently offered through Prime's plan design for specialty drug coverage, which includes the option to obtain specialty drugs at highly skilled specialty pharmacies. Specialty drugs are generally prescribed for an individual with a complex or chronic medical condition, or a very rare

disease. These drugs require additional patient education, adherence and support beyond traditional dispensing activities, and typically come at a very high monthly cost.

### 3. *Prescription Drug Claim Pricing and Processing*

17. Another of Prime's core PBM services is prescription drug claim processing for health plan members. This service involves the development and maintenance of proprietary point of sale claim processing of pharmacy claims, formulas and technology to support prescription reimbursement requests and fulfillment, as well as a team dedicated to handling post-processing appeals and inquiries.

### III. Prime's Response to the COVID-19 Crisis

18. Prime and its health plan customers have been on the front lines in responding to the COVID-19 pandemic in Oklahoma. Prime has taken numerous steps to ensure that its clients' members have adequate access to prescription drug treatments over the course of the pandemic.

19. For example, Prime has been actively involved in monitoring the prescription drug supply chain, which is threatened by drug hoarding and interruptions in business continuity and supply chains worldwide. Prime monitors the FDA and ASHP drug shortage websites up to two times per day. Once per week, Prime's Outreach Specialist Team contacts its top pharmacy chains and PSAOs to obtain updates on their operations, hours, service changes and supply and inventory status. In addition, pharmacies update Prime with any changes. This information is compiled and shared with clients daily to

ensure Prime's clients and Prime's member service department have the most up to date information regarding the status of pharmacies and supply chain.

20. Prime has also taken steps to ensure that members of the health plans it serves can access their prescriptions without violating social distancing requirements and in a manner designed to keep them safe.  For example, Prime has worked with its clients to allow early refills of prescription medications, which ensures that members do not have to leave the house multiple times to pick up prescriptions.  Prime has also worked with clients to extend existing prior authorizations; streamlining the prescription delivery process by eliminating the wait time sometimes associated with the prior authorization process and reducing the amount of contact needed between prescribers, Prime and pharmacies.  Prime has also waived requirements that members sign for their prescriptions, so that they may pick up a prescription without touching pharmacy tablets or writing implements.   Prime and its customers are also permitting retail pharmacies to provide home delivery or mailing of medications.   Prime has also suspended desk and onsite audits during the crisis period to ensure that pharmacies and pharmacists are focused on member services.

21. Prime has made these time-consuming efforts over the past approximately two months while facing the same challenges presented to all American businesses at this time.  Since March, Prime's workforce, including the teams tasked with developing and implementing the above measures, has been operating almost entirely remotely, with 99.9% of its employees working from home. Those employees are working under

challenging conditions.  They must juggle personal equipment and internet to allow for remote work, learn to use new collaboration platforms to work with their teams, and deal with their team's different or flexible schedules.  Many of these employees lack necessary childcare, and find themselves now responsible for home-school or caring for elderly or otherwise needy loved ones during traditional work hours.  I understand that Prime's human resources department has experienced an increased number of intermittent Family Medical Leave Act requests and anticipates an increasing number of personal and medical leave requests in coming weeks as employees continue to struggle through the crisis.

22. I personally started working from home on March 19th, 2020.  Due to the COVID-19 pandemic, my working hours have increased by an additional three to four hours per day, while I also otherwise support my household, which includes two essential workers.

23. The same teams that are working to respond to COVID-19 would be the teams that would work to comply with the Act if the State were to enforce it.

24. Prime's customers are also facing the remote workplace challenges described above.  The health plans' top priority at the moment is responding to the COVID-19 crisis.  They have made many changes to best serve their members during this time.  These plans would also be overburdened by the Act, which imposes significant oversight and other administrative enforcement responsibilities on the plans.

25. Prime anticipates that the economic disruption caused by the COVID-19 crisis will also impact its business, including because plans will need to adjust to beneficiary disenrollment due to job loss.

26. The efforts described above have taken Prime's resources, time and effort, and their continued implementation will continue to do so at least until the crisis has abated.

IV. <u>Implementation of the Act During the COVID-19 Crisis Will Immediately and Irreparably Harm Prime</u>

27. I am familiar with the provisions of the Act, and the effects that its provisions will have on Prime's business.

28. If the Act were to be implemented during the COVID-19 crisis, Prime and customer health plans would be faced with a large administrative burden of compliance at the same time as they continue to address the crisis.

29. In order for Prime adapt to the Act's restrictions on preferred pharmacy networks, it would need to update and renegotiate its pharmacy network contracts to reflect the fact that the network can no longer be restricted to a set number of entities, as well as to encompass potential new terms and conditions.

30. Prime would also need to update and renegotiate its contracts with health plans that have members filling prescriptions in Oklahoma.

31. The task of renegotiating these contracts is a cross-functional effort, involving Prime's pharmacy contracting, pricing, operations, specialty pharmacy and client engagement teams.  It would entail the negotiation of more than 900 pharmacy contracts, significant customer contracts, and other downstream vendor agreements.  Prime

estimates that for each of these contracts it would need to spend approximately 40 hours modeling and otherwise preparing for negotiations and participating in negotiations. These hours estimates do not include the amount of time spent waiting for responses from contractual counter-parties.

32. In Prime's experience, network contracting can take months or even up to a year to finalize in ordinary times. But this is an extraordinary time, as the Prime teams who would need to do this work, and all of the contractual counter-parties also responding to the COVID-19 crisis– and expect to be for the foreseeable future – are conducting business at a distance. Both Prime and the contractual counter-parties are all adapting in real time to remote work, including remote contract exchange and execution, making large scale renegotiations and adjustments under current circumstances incredibly burdensome.

33. Prime may need to update its reimbursement methodology for multi-source generics to align with the provision. This work would involve Prime's pricing analytics, finance and operations teams. These are the same teams that are monitoring drug shortages, and updating Prime's claims systems to open up access to medications and pharmacies for members during the COVID-19 crisis.

34. Prime's customers, health plans that have already made many changes to best serve their members during this time, would also be overburdened by the Act, which imposes significant oversight and other administrative enforcement responsibilities on the plans.

V. <u>Regardless of when it is Implemented, the Act Will Harm Prime by Limiting Prime's Ability to Put Downward Pressure on Prices, Ensure Network Quality, and Offer Varied and Nationally Uniform Benefit Design</u>

35. Even setting aside the work of attempting to implement new legislation during a public health crisis, the Act will irreparably harm Prime whenever it goes into effect against Prime's ERISA and Part D customers. The provisions of the Act operate together to change Prime's core PBM services by undoing the mechanism by which Prime can offer pharmacies enhanced customer volume in exchange for lower prices and higher service quality; severely limiting Prime's ability to employ any other means to put downward pressure on prescription drug prices, and interfering with Prime's methods for ensuring that its networks provide consistent high quality pharmacy services to its customer health plans' members. This damage to Prime's core PBM services also harms the national uniformity of prescription drug benefits offered by Prime's customers and administered by Prime.

VI. <u>Effects of the Act</u>

36. When read together, numerous provisions of the Act operate in several ways that harm Prime's ability to perform its core functions and diminish the value of Prime's services to its customer health plans.

   A. <u>The Act Restricts Prime's Ability to Put Downward Pressure on Prices and Offer Varied Benefit Design</u>

37. The Act undoes the mechanism by which Prime can offer pharmacies enhanced customer volume in exchange for lower prices and higher service quality. Because Prime is restricted from using mail-order pharmacies to meet standards, it may

need brick and mortar retail pharmacies to meet these standards, allowing those pharmacies to demand higher prices.

38. The Act also makes it difficult for Prime to negotiate favorable terms, because its prohibition on beneficiary directives or incentives renders Prime unable to offer increased volume to preferred pharmacies in exchange for favorable pricing.  And, because the Act requires Prime to admit any willing pharmacy to its preferred network, Prime can no longer rely on its primary method of providing increased volume (limiting the network to a set number of pharmacy organizations).

39. The Act and Emergency Rule eliminate Prime's ability to develop cost effective benefits covering specialty drugs and impede Prime's disease management efforts.  There are no brick-and-mortar specialty pharmacies in Oklahoma.  Therefore, Prime may need to open its specialty network to retail pharmacies because its specialty network would not meet the Act's access standards.  This may cause retail pharmacies to demand higher specialty pharmacy pricing despite offering less specialized services.

40. The Act also interferes with Prime's prescription drug reimbursement processes and practices designed to suppress drug prices because it prohibits Prime from reducing claim reimbursements post-processing in quality and performance-based programs.  In particular, the Act appears to prohibit Medicare pharmacy price concessions based on specific Medicare quality standards, which are implemented as part of the standard quarterly pharmacy performance review process.

41. The Service Fee Prohibition also increases the cost of care to Prime's customers, as it prevents Prime from recouping the costs of the services it offers to the pharmacies in its network. Prime eliminated all service fees as of the original effective date of the Act, for a total cost of $300,000 per year.

### B. The Act Interferes with Prime's Ability to Control the Quality of its Networks, Particularly with Respect to Specialty Pharmacies

42. Prime and its customers typically design plan benefits to limit specialty prescription dispensing to highly qualified and experienced pharmacists that have a proven track record of providing long-term savings and better clinical outcomes through improved total management of the disease states that demand specialty drugs, such as clinical programming or reporting related to dispensed products. By placing limits on Prime's ability to direct beneficiaries to those specialty pharmacies, the Act harms Prime's ability to monitor and set standards for specialty pharmacy quality.

43. Other provisions in the Act also interfere with the quality of all of Prime's networks. The Act's network access requirements increase pharmacy leverage to negotiate not only price, but also qualitative aspects of the preferred network terms and conditions. To continue to meet network access standards, Prime will lose important tools that ensure standards for quality services and value to members.

44. The Act also prohibits Prime from terminating, denying or limiting a pharmacy's network contract because it employs pharmacist who is on probation with the state Board of Pharmacy, which is inconsistent with Prime's and its clients' high quality standards.

45. Prime's practice of assessing performance and quality-based price concessions against pharmacies could also run afoul of the Act's provisions prohibiting service fees and post-sale claim reductions.

C. <u>The Act Harms Prime by Limiting its Ability to Serve its Customers with Innovative Plan Design, Lower Prices, and Nationally Uniform Benefits</u>

46. Health plans engage Prime to use methods to place downward pressure on costs, develop options for varied plan design, and administer their members' benefits nationwide. The Act significantly limits Prime's effectiveness in all of these services by eliminating many of its existing strategies.

47. Health plans engage Prime to administer benefits on a national scale. The Act interferes with national uniformity of the prescription drug benefits that Prime administers for its health plan customers. Prime, like other PBMs provide consistent services across states to create efficiencies and value. Under the Act, a health plan with members in Oklahoma and other states will likely need to employ multiple inconsistent pharmacy networks. In addition, members traveling to Oklahoma from other states will see a change in their prescription drug benefits when they cross the Oklahoma border, as that member will no longer be able to access preferred pricing at the same preferred network as they would otherwise have access to.

D. <u>The Act Imposes Significant Administrative Burden on Prime</u>

48. The Act imposes a significant administrative burden on Prime, especially at the outset, because Prime will be required to renegotiate its pharmacy networks and customer

15

contracts to respond to the Network Restrictions. As described above, this requires hours of labor and weeks or months of ongoing negotiations with health plans and pharmacies.

49. Moreover, given the national nature of the prescription drug benefit market, administering a different benefit model for Oklahoma only will impose a significant administrative burden on Prime and its customers.

VII. The Act will Harm Prime's Customers and their Members

50. The Act's impediments to Prime's services will burden Prime's customer health plans and their members. Because Prime generally uses pass-through pricing in its contracts, its customer health plans and their members (through cost-sharing and increased premiums) will bear the burden of higher drug prices.

51. The Act is also likely to cause consumer confusion. Plan members will likely need to be reissued benefit cards, and even after that may have a difficult time knowing where best to fill certain prescriptions.

52. The members will also be harmed by any reduction in pharmacy network quality. This is particularly so for members who need specialty drugs, who may now obtain those drugs from pharmacies that are less qualified to offer disease state management, and the health plans that cover them.

53. Prime supports PCMA's bringing this action on its behalf.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on May 13, 2020

_____

Marci Conlin