# Exhibit A

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF OKLAHOMA

| | |
|---|---|
| PHARMACEUTICAL CARE MANAGEMENT ASSOCIATION,<br><br>                          *Plaintiff*,<br><br>v.<br><br>GLEN MULREADY, *in his official capacity as* Insurance Commissioner of Oklahoma, and<br><br>OKLAHOMA INSURANCE DEPARTMENT,<br><br>                          *Defendants.* | No. CIV-19-977-J |

## DECLARATION OF JUSTIN WILSON, PHARM.D.

I, Justin Wilson, Pharm.D., declare the following:

### Qualifications

1. I am an Oklahoman, born and raised in Midwest City, and I graduated from Midwest City High School. In 1998, I graduated from the University of Oklahoma (OU), with distinction, with a Bachelor of Musical Arts/Trumpet. I then obtained my Doctor of Pharmacy degree (Pharm.D.) from the OU College of Pharmacy in 2002, and spent a year in the Community Care Pharmacy Practice Residency at the University of Iowa College of Pharmacy before returning to Oklahoma to begin my professional pharmacy practice.

2. For over a decade now, I have co-owned and operated three independent community pharmacies in small-town and big-city Oklahoma: the Valu-med Pharmacy in Fort Gibson (since 2010), the Bestyet HealthMart Pharmacy in Harrah (since 2007), and the Valu-med Pharmacy in Midwest City (since 2003). My co-owner is my father, Lonny Wilson, who is one of the original founders of the Pharmacy Providers of Oklahoma (PPOk) and a former president of the National Community Pharmacists Association (NCPA).

3. I am one of six members of the Oklahoma State Board of Pharmacy, and I have served on the Board for seven years. From 2016 to 2017, I served as the Board's President. My present term on the Board, which is my second, expires in 2023.

4. I also currently serve as the First Vice President for the NCPA. In addition, I am the Chair of the NCPA Steering Committee on National Legislative Affairs. From 2015 to 2017, I served as the Chair of the NCPA's Steering Committee on State Legislative Affairs, and from 2013 to 2015 I served as the Chair of the NCPA's Steering Committee on Pharmacy Payment Plans. I received the NCPA's Pharmacy Leadership Award in 2011, as well as the Preceptor of the Year Award in 2006.

5. From 2009 to 2012, I served as the Vice President (2009), President-Elect (2010), and then President (2011-12) of the Oklahoma Pharmacists Association (OPHA). Prior to that, in 2005, I received the OPHA's Innovative Pharmacy Practice Award.

6. Since 2004, I have held the title of Assistant Clinical Professor at the OU College of Pharmacy. Through that position, I have served in a number of different teaching, lecture, and instruction roles. Perhaps most relevant here, I have taught a Business Plan Competition elective, and I have repeatedly assisted with Pharmacy Law classes.

7. I have read The Patient's Right to Pharmacy Choice Act ("the Act"), as well as the brief of the Pharmaceutical Care Management Association (PCMA) seeking a preliminary injunction and several of the affidavits supporting that brief.

8. I make this declaration in my personal capacity, and not on behalf of the Board of Pharmacy, the OU College of Pharmacy, or any private organization with which I affiliate.

2

**Background**

9. My father and I own and operate independent community pharmacies. We are considered independent because we are privately owned and not owned or controlled by a national or regional chain, or publicly traded. We are considered community (or "retail") pharmacies because we operate brick and mortar stores in the community, which is the traditional pharmacy model, rather than something more remote like a mail-order pharmacy.

10. Indeed, for us, community is everything. I was very fortunate to grow up around pharmacy. My father was born in Midwest City as was I, and we have been part of the community and taking care of folks here as long as I can remember. My dad opened the Midwest City store in 1977, and it was special to be able to step into the family business when I graduated pharmacy school. As a community pharmacy, we have a very patient-care focused model. We counsel every patient on new prescriptions, we answer questions throughout the day, we identify and resolve potential drug therapy problems, and we're always available and willing to make sure our patients have the best health outcomes that they can. I'm very proud of the level of care we provide to patients in our community.

11. Pharmacy benefit managers, generally known as PBMs, are the middlemen in the pharmacy world. The health care system is very complex: Health plans, in particular, must interact with the physicians and hospitals, on one side, and the pharmacies and drug manufacturers, on the other side, for the benefit of their members. This is where PBMs came in. Originally, they were supposed to help manage a drug formulary for a health plan payer, and to contract with pharmacies on behalf of that payer. In other words, the PBMs came about as the go-between for the health plans, the pharmacies, and the manufacturers, serving as the negotiators and claims processors.

### The Patient's Right to Pharmacy Choice Act

12. What has happened over the years, however, is that PBMs have largely gone unregulated, and they have expanded greatly into areas that weren't originally intended, such as owning and operating pharmacies themselves. They have seen opportunities for profit and taken them. As a result, the original, far more limited PBM model has blown up into this huge multi-billion dollar industry that, in my opinion, now takes away from the ultimate goal of health care, harms pharmacies, and is not in the best interest of the patients.

13. There are very real problems with the PBM industry. Being in the trenches of community pharmacies, I have to deal with PBMs on a daily basis. They are in desperate need of more oversight. For this declaration, I will briefly discuss several of the ways in which PBMs abuse their power and harm pharmacies and patients. At the same time, I will point out various provisions of Oklahoma's Patient's Right to Pharmacy Choice Act that would combat the harms and temper the abuses.

14. **First, PBMs have almost total bargaining power with pharmacies, especially independent pharmacies.** Over the years, the ever-expanding PBMs have taken control out of the hands of pharmacists and patients, among others. For individual pharmacists like me, this means we have very little to no bargaining power in contracts with PBMs. The vast majority of the time, we have to accept whatever contract is offered by PBMs, no matter how bad or ridiculous, or we lose our businesses. They control us, in other words, and we have very little influence over them.

15. Nearly every provision in the Act would increase the bargaining power of pharmacies in some way, independent or otherwise. Section 6961's "retail pharmacy network access standards," for example, ensure that PBMs cannot just cherry-pick pharmacies for their

networks, which is what they are doing now. Instead, they have to consider where the actual Oklahoma population lives and deal with the pharmacies in those areas. Section 6962 has several provisions that will help with this, as well. The Insurance Department having oversight to make sure PBMs are not paying pharmacies they own higher rates is an important one for instance, as is the Department's authority to ensure that PBMs are permitting any willing and qualified providers into preferred networks. This will allow for fairer rate negotiation.

16. **Second, PBMs have increasingly been self-dealing.** The top three PBMs control more than 80 percent of the PBM market. These massive PBMs also own pharmacies, retail and mail-order, and they have increasingly been shifting their PBM market share to their own pharmacies and paying themselves more than they pay the competing pharmacies.

17. This problem is probably best addressed by the Act's requirement in Section 6961(C) that "Pharmacy benefits managers shall not require patients to use pharmacies that are directly or indirectly owned by the pharmacy benefits manager, including all regular prescriptions, refills or specialty drugs regardless of daily supply." Section 6963(E)'s forbidding PBMs from restricting an individual's choice in pharmacy will help, as well, as will Section 6962(B)(3)'s insistent that PBMs cannot reimburse a pharmacy any "less than the amount that the PBM reimburses a pharmacy owned or under common ownership with a PBM for providing the same covered services."

18. **Third, PBMs have increasingly restricted patient choice.** A patient's choice to utilize whatever pharmacy he or she wants is immensely important. But again, PBMs have been

19. forcing patients to utilize pharmacies owned or controlled by PBMs or to utilize mail-order pharmacies owned by PBMs. And this problem has definitely been getting worse.

19. This issue is best addressed by the Section 6963(E) provision mentioned above, which says PBMs "shall not restrict" individual patients' choices. Section 6961(D)'s restrictions on promotional materials help here, as well, as they prevent PBMs from keeping patients in the dark about the options available to them.

20. **Fourth, PBMs have drastically decreased reimbursements to pharmacies they don't own.** This is the counterpart to the second point above. Far more often than in the past, pharmacies not owned by PBMs have been receiving "upside-down" reimbursements, as I call them, where we pay more to obtain the medication than we receive in reimbursement. Now, this upside-down reimbursement happens dozens of times each day. This is very frustrating and unsustainable.

21. I recently ran a report for all prescriptions filled in one of my pharmacies from 4/1/20 to 5/28/20. During that time period, I found that 1,941 out of 9,920 prescriptions were paid below my acquisition cost for a loss of $10,416. And this is just looking at the cost of the drug. It does not take into account my overhead such as staffing, label costs, vial costs, etc. This model is not sustainable for any business. To further explain the issue, here are a few specific examples of losses: On 4/15/20, I filled #180 Hydroxychloroquine for a patient with rheumatoid arthritis. The lowest cost we could purchase this medication from our wholesalers was $238.37 for 180 tablets. We submitted the claim and were reimbursed a total of $53.46 ($28.46 from the PBM, and a patient copay of $25). This was a net loss of $184.91. Another prescription was filled on 5/1/20 for minocycline 90 ER. My purchase cost was $339.50, but we were only reimbursed $242.38 ($232.38 from the PBM, and patient

6

copay of $10) for a net loss of $97.12. These types of claims happen dozens of times per day in our pharmacies greatly reducing our ability to care for patients in our communities.

22. This is not an entirely new phenomenon, of course. I keep telling myself that surely there has to be a bottom, because it can't get much worse. And then it gets worse. They just keep whittling us down to the point now that, absent relief, we are going to have to start cutting staff, which has a negative impact on the care we provide, as well as the lives of our employees. Beyond that, we're just going to have to shut down the pharmacies entirely. To stay alive this long, we have had to be creative, adding additional services and expanding to areas beyond pharmacy. Other pharmacies, statewide and nationwide, have been forced to cut staff or shut down already.

23. In its filing, the PCMA claims that pharmacies agree to certain reimbursements, but this leads back to the point mentioned above: PBM contracts are "take it or leave it," and even when we take the contracts, the PBMs can change rates, add additional fees, or retroactively claw back funds months or sometimes years after the prescription was filled without much notice to the pharmacy.

24. This problem is addressed by the Act's barring in Section 6962(B)(3) a PBM from reimbursing "a pharmacy or pharmacists in the state an amount less than the amount that the PBM reimburses a pharmacy owned by or under common ownership within a PBM for providing the same covered services," as well as the Section 6962(B)(6)'s provision prohibiting the retroactive reducing of reimbursements.

25. **Fifth, PBMs have been misusing Pharmacy Board actions and acting as quasi-regulators.** The State Pharmacy Board has the authority to take actions against pharmacists, including suspension and probation. When we place pharmacists on active probation, *i.e.*,

7

where they can still operate their pharmacy while on probation, the goal is to try to get them back toward compliance and good standing. We want rehabilitation. If they follow our instructions, then they will eventually be returned to normal status. (Of course, if it was something that put public health or safety at risk, we would take more drastic action.) But what PBMs have been doing is taking this type of rehabilitative action – probation or a fine, etc. – and using it as a reason to completely cease contracting with a pharmacy. And this can put the pharmacy out of business, especially smaller pharmacies, which is the opposite of what we are trying to accomplish. This is overstepping their role.

26. PBMs should have no regulatory authority over a pharmacy in this manner. This is the job of the Pharmacy Board, which is there to regulate the profession. PBMs shouldn't go above and beyond and destroy a pharmacy when we are seeking to rehabilitate them. If the State Board deems it appropriate for a pharmacist to practice (even after a fine or probation), they should not be further punished by PBMs in terms of cancelled contracts, or forcing a pharmacy to fire employees that have had action taken on their license. Our goal is not to put people out of business, unless they actually threaten public safety.

27. This problem is addressed by Section 6962(B)(5)'s barring a PBM from denying, limiting, or terminating "a pharmacy's contract based on employment status of any employee who has an active license to dispense, despite probation status, with the State Board of Pharmacy."

28. **Sixth, there is a lack of transparency in the PBM system.** This is the problem called "spread pricing." PBMs reimburse the pharmacy for medication at one rate, and they charge their client health plan a different rate, and then they pocket the difference from the "spread." And, most importantly, there's no way for the health plan or the pharmacy to tell what that spread or difference is. We just don't know. Transparency is needed. Section

8

6966's giving oversight to the Insurance Commissioner to handle individual complaints and the formation of a Patient's Right to Pharmacy Choice Advisory Committee should help address transparency issues, especially given that the committee will have the ability to hold hearings and subpoena witnesses and records.

**COVID-19**

29. The PCMA and their witnesses repeatedly claim to be on the "front-line" of confronting the COVID-19 pandemic. But this seems like a stretch to me. PBMs are almost by definition middlemen. Although I certainly don't begrudge sincere efforts they have made to assist with COVID-19 relief, I am struggling to figure out how they qualify as front-line workers, or how their business model has been impacted here.

30. I believe the most important way to help pharmacy patients during the COVID-19 crisis is to increase access and quality of care. Community pharmacies across Oklahoma have been champions in this effort. Indeed, in responding to something like the COVID-19 crisis, that's where you really see the strength or importance of small community pharmacies. Community pharmacies have stepped up to do everything they could to take care of their patients during this trying time. We've seen COVID-19 testing in independent pharmacies, delivery services for the elderly and vulnerable so they don't have to get out and endanger themselves, and drive-thru-only for the same purpose, to encourage folks to come get their medication. But it is those same pharmacies that are threatened most by PBM abuses.

**Recent activity and harms**

31. In the past year, since the Oklahoma Legislature passed the Patient's Right to Pharmacy Choice Act, but before it has been enforced, we've been seeing proposed contracts and

contractual revisions coming from PBMs out that are egregiously awful for us. I've never seen anything like it.

32. For example, I received a contract proposal from a PBM a week ago. Based on data analysis, we would be losing $14 per prescription under the contract. This is the worst one I've ever seen, in nearly 20 years of practice. We tried to renegotiate with the PBM, but made no progress. It's a take-it-or-leave-it proposition. So I'm going to have to reject it. And when I reject it I am making the choice to lose patients that have that PBMs' insurance. But I don't have a choice. If I take them, I lose $14 on every sale, on average. This is where the system is truly, truly broken. These contracts are so bad I am forced to reject them, and the patients lose the ability to choose my pharmacy. They can either go to a pharmacy willing to take the loss, or, more likely, they'll probably be forced to use a mail-order company that is owned by the PBM.

33. At the end of the day, if we do not have community pharmacies, then we do not have sufficient patient care. The current model is weighted toward PBM profits, control, and direction to the pharmacies they own. This is harming community pharmacies that have been caring for Oklahoma citizens for years. Patients should have the right to receive care where they choose and PBMs should reimburse appropriately to allow for that care. Our patients deserve the best care possible and you cannot achieve that over the phone, or through a mailbox. Community pharmacists are an integral part of the health care system and positively affect the lives of Oklahoma citizens on a daily basis.

34. Currently, there is little transparency from or oversight of PBMs. If they are truly acting to lower prescription costs, as they claim, then why are they not transparent on how their reimbursements function? We need transparency from PBMs. We need transparency to look at where the money is going, and we desperately need oversight to level the playing

field, ensure good business practices, and to help pharmacies continue to provide a high level of care for the citizens of Oklahoma. The Act provides necessary oversight and regulation of PBMs.

I state under penalty of perjury that the foregoing is true and correct to the best of my knowledge. Executed this 2nd day of June, 2020 in Midwest City, OK.

_____
JUSTIN WILSON, PHARM.D.