# Exhibit B

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF OKLAHOMA

PHARMACEUTICAL CARE
MANAGEMENT ASSOCIATION,

*Plaintiff*,

v.

GLEN MULREADY, in his official capacity as
Insurance Commissioner of Oklahoma, *et al.*,

*Defendants*.

**No. 19-cv-977**

**DECLARATION OF DEBRA L. BILLINGSLEY**

Pursuant to 28 U.S.C. § 1746, I, Debra L. Billingsley, hereby declare and state as follows:

1.     I am the Executive Director of the Oklahoma Pharmacists Association ("OPhA"), a trade association that represents the interests of over 400 independent pharmacies in Oklahoma. Before that, I served for 14 years as the Executive Director of the Kansas State Board of Pharmacy, a State agency charged with regulating all aspects of the distribution of prescription medications in Kansas.

2.     Based on my experience, I have extensive knowledge about the practices of pharmacy benefit managers ("PBMs") and their relationships with patients, pharmacies, and prescription drug benefit plans. OPhA's members contract with PBMs and interact with them on a daily basis. As a result, my position has required me to educate myself on various PBM practices—through conversations with OPhA's members and other organizations, attendance at lectures and other educational events, and the review of contracts, documents, articles, and studies relating to PBM-pharmacy relationships. I have used this knowledge to help advocate for meaningful reforms to the PBM industry, including advocacy that helped lead to the passage of the Patient's Right to Pharmacy Choice Act ("Pharmacy Choice Act"), 36 Okla. Stat. §§ 6958-68, the State law that the plaintiff challenges in the above-referenced litigation.

3.      This declaration is being offered to explain the delivery of pharmacy benefits, which include interactions among patients, pharmacies, and plans.  It also offers my opinion on the need for the various provisions of the Pharmacy Choice Act and its implementing regulations that are now subject to challenge as well as the implications for Oklahoma pharmacies if the State is preliminarily enjoined from enforcing the Act.  In preparing this declaration, I reviewed the complaint that the Pharmaceutical Care Management Association ("PCMA") filed in this action, along with PCMA's motion for a preliminary injunction.  Although I make this declaration based upon my personal knowledge, I have identified various sources that support my conclusions and opinions.  If called upon, I can testify competently on each of the topics discussed herein.

**Summary of Opinions**

4.      As explained below, the Pharmacy Choice Act regulates a number of practices of PBMs that are harmful to the safe and efficient delivery of prescription drugs to patients.  The provisions that PCMA seeks to preliminarily enjoin: (a) ensure minimum access standards for the pharmacy networks that PBMs sell to plans and offer in Oklahoma; (b) prohibit PBMs from forcing patients to use PBM-owned pharmacies; (c) prevent PBMs from arbitrarily discriminating against pharmacies willing to accept the PBM's standard terms and conditions for its preferred network; (d) promote parity across preferred and non-preferred in-network pharmacies and ensure predictability and fairness for patients; (e) regulate fee and reimbursement practices to promote fairness in the relationship between PBMs and pharmacies; and (f) ensure that pharmacists can appropriately advise their patients on the cost of medications.

5.      In my opinion, these provisions are necessary to ensure that Oklahoma's residents have sufficient access to quality medicine, protect the solvency of the State's retail pharmacies, which helps increase patient access to pharmacy services, prevent PBMs from depriving patients

of important medical information, and regulate business practices of PBMs that the legislature perceived to be unfair.

**Qualifications**

6.      I graduated from Missouri State University with a Bachelor of Science in Education and received my Juris Doctor from Washburn University.  I was admitted to practice law in the States of Kansas and Missouri—though I am presently inactive in both jurisdictions.

7.      I served for a number of years in the Kansas Attorney General's Office in the Legal Opinions and General Counsel Division primarily working for regulatory agencies.

8.      In 2003, I transitioned to the Kansas State Board of Pharmacy and served as its Executive Director from September 2003 until August 2015.  The Board regulated and licensed all aspects of the drug distribution system in the State and had oversight of the Prescription Drug Monitoring Program, which is designed to monitor and prevent the abuse of certain prescription drugs.  During my time at the Board, I also was exposed to the practices of PBMs and their effect on prescription drug dispensing.

9.      In 2015, I became the Executive Director of OPhA—a position that I continue to hold to this day.  OPhA engages in advocacy, communication, and promotion on behalf of over 400 independent pharmacies in Oklahoma.  As part of my work as Executive Director, I speak regularly with our members, stay current on issues they are facing, read trade publications, studies, and articles on issues facing pharmacies, attend lectures and other events, and review contracts, documents, and studies related to PBM-pharmacy relationships.

10.      I also serve on the Oklahoma Health Care Authority Medical Advisory Committee, which was created by Oklahoma law, *see* 63 Okla. Stat. § 5009.2, to advise the Oklahoma Health

Care Authority about health and medical care services. In addition, I serve as a liaison for independent pharmacy at the Oklahoma State Board of Pharmacy.

11. No party to this litigation is compensating me based on my work related to the preparation of this declaration. A copy of my resume is attached to this declaration.

### Overview of the Provision of Pharmacy Benefits

12. The delivery of pharmacy benefits from plans to beneficiaries is governed by a series of relationships among health plans (and sometimes insurers), PBMs, pharmacists, wholesalers, and drug manufacturers.

13. Health plans are offered by private and public employers and unions, and through private purchase and federal and State programs (such as Medicare and Medicaid). Some health plans purchase insurance, and others pay for benefits directly and, in effect, self-insure. As a result, health plans are subject to varying forms of federal and State regulation, including the Employee Retirement Income Security Act of 1974 ("ERISA"), Medicare, Medicaid, and State insurance laws.

14. Prescription drug benefit plans define the number and classes of pharmaceutical drugs that are covered, which is referred to as a formulary. Subject to certain regulations, the plan also defines the beneficiaries' obligations to pay a portion of the cost of pharmaceutical drugs through copayment and coinsurance obligations.

15. PBMs act as intermediaries between pharmacies, on the one hand, and public and private health plans, insurers, self-insured entities, and health maintenance organizations, on the other. PBMs do not dispense drugs (unless dispensed at a mail-order or specialty facility owned by a PBM), nor do they dictate the pharmaceutical benefits that a plan ultimately provides.

16.     PBMs contract with health plans—including plans subject to regulation under ERISA and Medicare Part D—to process claims and facilitate payments for the pharmaceutical products and services that beneficiaries consume.  By doing so, PBMs are able to aggregate the demand of all of the beneficiaries of the plans with whom those PBMs contract.

17.     PBMs contract separately with pharmacies to create networks to supply prescription drugs to the beneficiaries of the plans that the PBMs service.  These contracts obligate participating pharmacies to accept reimbursements for drugs pursuant to various formulas set by PBMs.  When a plan beneficiary (*i.e.*, patient) fills a prescription, the pharmacy contacts the PBM electronically to obtain the patient's coverage and copayment information.  The patient is then required to remit the copayment or coinsurance amount, and the PBM provides the pharmacy with an additional amount as reimbursement for dispensing the prescription.  The PBM then charges the health plan—typically at a price higher than the amount that the PBM reimbursed the pharmacy.

**PBMs Have Tremendous Leverage Over Pharmacies**

18.     The three largest PBMs are OptumRx (a subsidiary of United Health Group), CVS Caremark (a subsidiary of CVS Health), and Express Scripts (a subsidiary of Cigna Corporation).  They claim to provide PBM services for more than 268 million Americans—or over eighty-five percent of all Americans with health insurance coverage.  *See* CVS Health, *Pharmacy Benefits Management*, https://cvshealth.com/about/our-offerings/pharmacy-benefits-management (stating that it provides PBM services for "102 million plan members"); Express Scripts, *What's a Pharmacy Benefit Manager?*, https://www.express-scripts.com/corporate/articles/whats-pharmacy-benefit-manager (stating that it provides PBM services for "100 million people"); OptumRx, *Pharmacy benefit management solutions*, https://professionals.optumrx.com/services/

pbm.html (stating that it provides PBM services for "over 66 million members"); *see also* U.S. Census Bureau, *Health Insurance Coverage in the United States: 2018*, at 3 (Nov. 2019) (*available at* https://www.census.gov/content/dam/Census/library/publications/2019/demo/p60-267.pdf) (explaining that 297 million Americans had health insurance coverage in 2018).

19. Given the concentration in the PBM industry, pharmacies (including large retail chains) have limited bargaining power when negotiating with PBMs. A pharmacy that refuses to enter into a contract with a PBM risks not serving all of the beneficiaries that that PBM controls. In 2012, for example, Walgreens lost an estimated $4 billion in annual revenue after a dispute with Express Scripts resulted in the suspension of their contract. Bruce Jaspen, *Walgreens and Express Scripts Reach Deal*, N.Y. Times, July 19, 2012, http://www.nytimes.com/2012/07/20/business/walgreen-and-express-scripts-settle-their-dispute.html.

20. As a result, the contracts that govern the relationship between PBMs and pharmacies generally provide PBMs with unilateral authority to dictate the amount that they will reimburse pharmacies for generic drugs, require pharmacies to dispense prescriptions regardless of the amount the pharmacy is reimbursed, and impose other restrictions on the practice of pharmacy, including what information pharmacists may discuss with their patients and which drugs they are authorized to dispense. Except where federal or State law imposes access requirements, PBMs are also under no obligation to contract with pharmacies and rarely negotiate over these core terms.

**PBM Spread Pricing and Negative Reimbursements**

21. The principal means by which PBMs make money is through "spread pricing." Under this arrangement, PBMs profit off the difference between what they reimburse pharmacies and what they charge insurers and plans for a particular drug. To achieve this spread, PBMs often

maintain two sets of price lists.  Allison Dabs Garrett & Robert Garis, *Leveling the Playing Field in the Pharmacy Benefit Management Industry*, 42 Val. U. L. Rev. 33, 40 (2007).  PBMs use maximum allowable cost ("MAC") lists to set the amount that they reimburse pharmacies for dispensing generic drugs.  *Id.*  PBMs then use a second list to set the amount they charge plans.  *Id.*  The difference between these amounts is referred to as the "spread."  *Id.*

22.     The cumulative effect of spread pricing can be substantial.  For example, when the State of Ohio audited the PBMs that were serving its Medicaid program, it determined that the PBMs had profited $224.8 million from spread pricing during a single year.  Dave Yost, *Ohio's Medicaid Managed Care Pharmacy Services Auditor of State Report* 2 (Aug. 16, 2018), https://ohioauditor.gov/auditsearch/Reports/2018/Medicaid_Pharmacy_Services_2018_Franklin. pdf.

23.     Over the last decade, PBMs have expanded the use of so-called negative reimbursements—a form of spread pricing where a PBM reimburses a pharmacy at less than the pharmacy's cost to acquire a particular drug.  Studies have suggested that negative reimbursements have driven more than sixteen percent of rural pharmacies out of business.  Abiodun Salako et al., *Update: Independently Owned Pharmacy Closures in Rural America*, 2003-2018, RUPRI Center for Rural Health Policy Analysis (July 2018), https://rupri.public-health.uiowa.edu/ publications/policybriefs/2018/2018%20Pharmacy%20Closures.pdf.   This, in turn, restricts patient access to pharmacies and pharmacy services.

24.     Even large retail chains are not immune to negative reimbursements.  For example, Walmart claims to have suffered large financial losses because PBMs have reimbursed it at less than Walmart's cost to acquire some of the drugs that its pharmacies dispensed.  Nathan Layne,

*Walmart has a drug problem*, Business Insider, Aug. 18, 2015, http://www.businessinsider.com/r-wal-marts-drug-problem-pharmacy-business-drags-on-profit-2015-8.

25.     Health plans often have no insight into how much PBMs are profiting from spread pricing.  Katherine Eban, *Painful prescription*, Fortune, Oct. 10, 2013 (discussing conflicts among PBMs and their customers associated with undisclosed spreads), https://fortune.com/2013/10/10/painful-prescription/.  That is because PBMs treat their price lists as proprietary and confidential, and do not disclose them even to the plans they purport to serve.  *See id.*  In addition, the use of undisclosed spreads creates conflicts that can lead PBMs to promote drugs that are more costly to the plan, because those drugs produce wider profit margins for the PBM.  *See id.*

26.     Notably, PCMA has claimed that PBMs do not deal in "plan assets" when they reimburse pharmacies on behalf of a plan, and that they owe no fiduciary duties to the plans that they serve—whether under ERISA or otherwise.  Br. of PCMA et al. as *Amici Curiae* 21, *Doe v. Express Scripts, Inc.*, No. 18-346 (2d Cir. June 20, 2018) (2018 WL 3185904).  PCMA has claimed instead that PBMs' payments to pharmacies "relate to the basic administration of [the PBM's own business]," *id.* (citation omitted), which means that PBMs have no obligation to pass any cost-saving measures on to plans or otherwise act in their best interest.

**PBM Gag Clauses**

27.     To help maintain pricing secrecy, PBMs typically include gag clauses in their contracts with pharmacies.  These clauses prohibit pharmacists from disclosing to patients and plans the amount that the PBM reimbursed the pharmacy for dispensing a drug.

28.     The use of gag clauses can have real financial consequences for patients.  For example, a PBM may charge the patient a copay (*e.g.*, $20) that exceeds the cost that the pharmacy would otherwise charge for the drug if the patient declined to use his or her insurance (*e.g.*, $8).

In this situation, a pharmacist could save patients money by alerting them to this fact, but gag clauses—such as ones that PBMs have imposed in Oklahoma—prevent pharmacists from doing so. Robert Pear, *Why Your Pharmacist Can't Tell You That $20 Prescription Could Cost Only $8*, N.Y. Times, Feb. 24, 2018, https://www.nytimes.com/2018/02/24/us/politics/pharmacy-benefit-managers-gag-clauses.html. Notably, a recent study published in the Journal of the American Medical Association found that, for twenty-eight percent of all generic prescriptions, PBMs charge a copayment that exceeds the cost the patient would otherwise pay for her prescription. Karen Van Nuys, et al., *Research Letter: Frequency and Magnitude of Co-payments Exceeding Prescription Drug Costs*, J. Am. Med. Ass'n, Mar. 13, 2018, https://jamanetwork.com/journals/jama/fullarticle/2674655.

### PBM Fees and Other Charges

29.     PBMs also impose fees upon pharmacies after the point of sale that further reduce the amount of money that the pharmacy receives from the PBM on any given claim. These fees are not reflected in the amount that is charged at the point of sale, which is used to generate a patient's copayment or coinsurance obligation.

30.     The use of these post-sale fees causes patients to pay more out of pocket than they would if the fee were assessed at the time the claim was processed. By way of example, a prescription might cost $50 at the point of sale, requiring the patient to pay $10 to cover the plan's copayment obligation of twenty percent, but the PBM may then recoup $10 in post-sale fees charged to the pharmacy—which means the patient's co-pay should have been only $8 (*i.e.*, twenty percent of $40). The Centers for Medicare and Medicaid Services ("CMS") has highlighted this problem in various publications. *See, e.g.*, CMS, *Fact Sheet: Medicare Part D – Direct and*

*Indirect Remuneration (DIR)* (Jan. 19, 2017), https://www.cms.gov/newsroom/fact-sheets/ medicare-part-d-direct-and-indirect-remuneration-dir.

### PBM Control and Use of Affiliated Pharmacies

31.     PBMs have used their position to capture a share of the retail pharmacy market—including in Oklahoma.  *See* Darrel Rowland, *Specialty drugs: The new arena for pharmacy benefit manager profits?*, Columbus Dispatch, Apr. 24, 2019, https://www.dispatch.com/ news/20190423/specialty-drugs-new-arena-for-pharmacy-benefit-manager-profits.  PBMs have done so by prohibiting their network pharmacies from distributing "specialty drugs," which are typically higher-cost drugs that require special handling.  *Id.*  Some PBMs have also expanded the designation of "specialty drugs" to include non-specialty medications that have been on the market for a long time.  *Id.*  PBMs then require patients to fill specialty prescriptions using mail-order pharmacies owned by the PBMs.  *Id.*  In evaluating these practices, CMS has concluded that PBMs have used pharmacy contracts "in a way that inappropriately limits dispensing of specialty drugs to certain pharmacies."  CMS, *Medicare Program; Contract Year 2019 Policy and Technical Changes to the Medicare Advantage, Medicare Cost Plan, Medicare Fee-for-Service, the Medicare Prescription Drug Benefit Programs, and the PACE Program*, 82 Fed. Reg. 56,336, 56,410 (Nov. 28, 2017).

32.     The forced use of PBM-owned, mail-order pharmacies can negatively affect patients in at least two ways.  First, patients are required to go through mail-order pharmacies for medications that they could otherwise obtain at their local drug store.  Second, the use of mail-order pharmacy can harm patients—either through delays or the exposure of medications to temperature extremes.  Alex Smith, *Extreme Temperatures May Pose Risks To Some Mail-Order*

10

*Meds*, NPR, Jan. 7, 2019, https://www.npr.org/sections/health-shots/2019/01/07/673806506/extreme-temperatures-may-pose-risks-to-some-mail-order-meds.

### Discriminatory Reimbursement Practices for Non-Affiliated Pharmacies

33.     Some PBMs also reimburse their own affiliated pharmacies substantially more than they pay non-affiliated pharmacies.  For example, CVS Caremark paid CVS pharmacies forty-six percent more for generic drugs than it paid pharmacies at Walmart and Sam's Club.  Marty Schladen & Cathy Candisky, *CVS paid itself far more than some major competitors*, Columbus Dispatch, Jan. 20, 2019 (citing a report by the State of Ohio), https://www.dispatch.com/news/20190120/cvs-paid-itself-far-more-than-some-major-competitors-report-says.   And CVS Caremark paid itself over five times as much as it reimbursed independent pharmacies for some medications—or $324.91 more on a single transaction.  Linette Lopez, *What CVS is doing to mom-and-pop pharmacies in the US will make your blood boil*, Business Insider, Mar. 30, 2018, https://www.businessinsider.com/cvs-squeezing-us-mom-and-pop-pharmacies-out-of-business-2018-3.  CVS then sent letters to independent pharmacists stating that selling their businesses to CVS was an "attractive and practical option" in the face of "declining reimbursements."  *Id.* (linking to CVS letter).

### State Regulation of PBMs

34.     Nearly all States and the District of Columbia have enacted laws regulating PBMs. These laws cover everything from rate reimbursement and transparency regulations to PBM licensing and audit requirements.

### The Oklahoma Patient's Right to Pharmacy Choice Act

35.     The Oklahoma legislature passed the Patient's Right to Pharmacy Choice Act unanimously, and it was signed into law on May 21, 2019.  Codified at 36 Okla. Stat. §§ 6958-68,

the Act's stated purpose "is to establish minimum and uniform access to a provider and standards and prohibitions on restrictions of a patient's right to choose a pharmacy provider."  36 Okla. Stat. § 6959.

36.     The Pharmacy Choice Act achieves its legislative ends largely by regulating PBMs. The Act defines a PBM to include "a person that performs pharmacy benefits management and any other person acting for such person under a contractual or employment relationship in the performance of pharmacy benefits management for a managed-care company, nonprofit hospital, medical service organization, insurance company, third-party payor or a health program administered by a department of this state."  *Id.* § 6960(3).

37.     *PBM-Pharmacy Network Provisions:*  The Act includes provisions that regulate the quality of the pharmacy networks that PBMs sell to their insurer and plan customers.  The Act does so by ensuring that varying types and percentages of patients are within a specific geographic radius of a network pharmacy.  *Id.* § 6961(A).  The Act precludes PBMs from relying on mail-order pharmacies to satisfy these access standards.  *Id.* § 6961(B).  In addition, the Act precludes a PBM from requiring patients to use a pharmacy owned directly or indirectly by a PBM.  *Id.* § 6961(C).  To ensure compliance with these requirements, the Act requires the Insurance Department to review and approve of retail pharmacy networks.  *Id.* § 6962.  These provisions help ensure that PBM networks provide sufficient access to pharmacies in Oklahoma and prevent PBMs from steering patients to PBM-owned pharmacies.

38.     *Any-Willing-Provider Provision:*  The Act also requires a PBM to accept into its preferred networks any pharmacy that is willing to accept the terms and conditions that the PBM has established for other pharmacies as a condition for participation.  *Id.* § 6962(B)(4).  This

provision prevents PBMs from arbitrarily discriminating against pharmacies willing to accept the PBM's standard terms and conditions.

39.     *Patient Choice:*  The Act provides that a health insurer or PBM may not restrict a patient's choice of an in-network pharmacy, and it limits the ability of these PBMs to use co-payments or other financial incentives or penalties as a means of affecting a patient's choice of an in-network pharmacy.  *Id.* § 6963(D), (E).  These provisions promote parity across in-network pharmacies and ensure predictability and fairness for patients.

40.     *PBM Fee and Reimbursement Provisions:*  Other provisions of the Act: (i) prevent PBMs from charging pharmacists or pharmacies certain fees, *id.* § 6962(B)(2); (ii) preclude PBMs from reimbursing pharmacies less than they would a pharmacy that is owned by or affiliated with the PBM, *id.* § 6962(B)(3); (iii) prohibit PBMs from retroactively denying or reducing reimbursement for a covered claim unless the original claim was a product of fraud or an error that was identified in a regulated audit, *id.* § 6962(B)(6); and (iv) prevent a PBM from refusing to reimburse a pharmacy for services rendered in the event that the PBM subsequently terminates the pharmacy's contract or network participation, *id.* § 6962(B)(7).  These provisions promote fairness in the relationship between PBMs and pharmacies, and help ensure the continued solvency and viability of the State's pharmacies.

41.     *Anti-Gag Provision:* The Act includes a provision that bans PBMs from using so-called gag clauses, which preclude pharmacists from discussing with their patients "any differential between the individual's out-of-pocket cost or coverage with respect to acquisition of the drug and the amount an individual would pay to purchase the drug directly."  *Id.* § 6962(C). This provision ensures that pharmacists can appropriately advise their patients on the cost of medications.

42.     *Health Insurer Obligations:*  The Act also imposes upon a "health insurer" the duty to monitor the activities of the PBMs with which they work, and ensure that their PBMs are satisfying the requirements of the Act.  *Id.* § 6963.  The Act defines a "health insurer" to mean "any corporation, association, benefit society, exchange, partnership or individual licensed by the Oklahoma Insurance Code."  *Id.* § 6960(1).  This provision encourages accountability by preventing health insurers from shirking their independent responsibilities under the Act simply by contracting with a PBM.

43.     *Severability Clause:*  The Act includes a severability clause, which is designed to save as much of the law as possible should a court find any single provision to be unconstitutional. *Id.* § 6968.

### Implementing Regulations

44.      On October 22, 2019, Governor Stitt signed regulations adopted by the Insurance Commissioner intended to implement the Pharmacy Choice Act.  The regulations were scheduled to go into effect on the same day as the Act:  November 1, 2019.

45.     PCMA has challenged a handful of these regulatory provisions, and its motion for a preliminary injunction seeks to enjoin three in particular, which are detailed below.

46.     *Contract Approval Rule:*  The regulations require a health insurer utilizing the services of a PBM to approve all contractual documents utilized by its contracted PBMs and its retail pharmacy network to ensure compliance with the Act.  Okla. Admin. Code § 365:25-29-9(c)(1).  This regulation implements requirements of the Pharmacy Choice Act mandating that health insurers monitor and ensure that their PBMs are complying with the requirements of the Act.  36 Okla. Stat. § 6963.

47.     *Specialty Drug Regulation:*   The regulations also clarify that "[t]he act draws no distinction between regular or specialty drugs, both being prescription medications, therefore, specialty drugs fall within the contemplation of the act."   Okla. Admin. Code § 365:25-29-7.1(a)(2).   This regulation ensures that Oklahoma patients have sufficient access to specialty medications.

48.     *Promotional Material Regulation:*   The regulations further clarify that PBMs "shall not in any manner on any material, including but not limited to mail and ID cards, include the name of any pharmacy, hospital or other providers unless it specifically lists all pharmacies, hospitals and providers."   *Id.* § 365:25-29-7.1(a)(3).   This regulation implements a provision of the Pharmacy Choice Act imposing similar restrictions.   36 Okla. Stat. § 6961(D).   The regulation and the provision that it implements ensure parity across the various preferred and non-preferred pharmacies in a PBM's networks so that patients are not steered to one pharmacy over another that offers similar services.

**The Pharmacy Choice Act Promotes a Variety of Important State Interests**

49.     In my opinion, the Pharmacy Choice Act is necessary to promote the efficient and safe delivery of prescription drugs to patients located in the State of Oklahoma.   The Act does so by establishing minimum standards for access to the pharmacy networks that PBMs sell to health plans and insurers, preventing PBMs from using their control over access to force patients to use PBM-affiliated pharmacies, opening up preferred networks to any pharmacy willing to meet the PBM's established terms and conditions, and allowing patients to choose freely among pharmacies within a preferred or non-preferred network.   The provisions are particularly important for the State's rural populations, which otherwise might be forced to travel substantial distances to see a pharmacist.   PCMA is seeking to preliminarily enjoin all of these provisions.

50.     The Act also includes a number of provisions necessary to protect the solvency of the State's retail pharmacies.  *See* 36 Okla. Stat. § 6962(B)(2), (3), (6), (7).  As explained above, pharmacies are under increased financial pressure as PBMs force them to do more with less, reimburse them at less than their cost to acquire certain drugs, and charge various fees after the point of sale that further reduce margins.  As a result of these and other practices, PBMs have forced the closure of hundreds of pharmacies across the country, which decreases patient access to a variety of important pharmacy and healthcare services.  Compared to the enactments of other States, the Pharmacy Choice Act's regulation of retroactive modifications to reimbursements, limitations on certain fees, and prohibition on discriminatory reimbursement practices represents a modest approach to provide some measure of financial protection against predatory PBM business practices.  PCMA is seeking to preliminarily enjoin these provisions as well.

51.     Finally, the Act includes provisions designed to prevent PBMs from depriving patients of important medical information, which bears directly on the costs that patients pay for their medications, and it regulates other business practices of PBMs that the legislature perceived to be unfair, including arbitrarily reducing the amount of reimbursement after the point of sale.  Although PCMA is seeking a permanent injunction against the enforcement of this provision, it is not among those that PCMA seeks to preliminarily enjoin.

52.     The State's decision to protect patients and pharmacies is all the more compelling because of the crucial role that pharmacists play caring for Oklahoma's 4 million residents.  Last year, the State's pharmacists dispensed nearly 45 million prescriptions.  Beyond that, Oklahoma's pharmacists help alleviate a critical gap in access to health care.  Unfortunately, Oklahoma ranks last in patient access to a physician.  For many Oklahomans, their local pharmacy serves as the most convenient—and sometimes only—means to access the health system.  For example, the

State's pharmacists are authorized to administer vaccines and other medications, and they also perform tests for cholesterol, blood glucose, the flu, streptococcus, and even COVID-19.  As a result, they play a crucial role in both preventative and diagnostic medicine—particularly for pediatric and elderly patients.  In addition, they often serve as an invaluable resource for patients who cannot or have not yet been able to consult a physician.  As examples, the parent of a sick child may seek advice from a pharmacist on the use of over-the-counter medication before a pediatrician is available, and other patients may seek advice on matters that profoundly affect the public health—from quitting smoking to managing diabetes.

53.     The provisions that PCMA seeks to preliminarily enjoin are all the more important in light of the COVID-19 pandemic.  Pharmacies have been deemed essential businesses, and pharmacists have felt morally compelled to remain open to care for their patients.  But the practical realities of the pandemic have meant that pharmacists must do more with less.  Because of declining reimbursements and other financial pressures imposed upon them by PBMs, pharmacists have had to rely increasingly on other sales—from greeting cards to grocery items—to remain profitable.  The pandemic has effectively cut off these sources of revenue.  At the same time, pharmacists' costs have increased.  Many pharmacists in Oklahoma have taken to delivering medications to their customers—free of charge—but there are costs to the pharmacist associated with this service.  Others have made arrangements to keep their doors open, but have struggled to acquire personal protective equipment to keep themselves safe during the pandemic.  At the same time, some pharmacists in Oklahoma have been administering COVID-19 tests, and countless more have dispensed medications to sick patients without knowing whether they are infected.

54.     Meanwhile, it has been business as usual for many PBMs.  Some PBMs were insisting on patient signatures, even as patients were refusing to sign, fearful of holding a pen at

the pharmacy.  It required an order from the Insurance Commissioner to force some PBMs to suspend this requirement.  *See* Okla. Dep't of Ins., LH Bulletin No. 2020-02 (Amended) (Mar. 17, 2020).  Other PBMs continued to impose ruinous audits, even as pharmacies were working with reduced staff and taking other precautions to safely serve their patients.  Again, it took an order of the Insurance Commissioner to prevent some PBMs from conducting these audits during the pandemic.  *See id.*

55.    In my opinion, there are pharmacies that will not survive the year if the State is prevented from enforcing the provisions of the Act that PCMA seeks to preliminarily enjoin. Pharmacies were already struggling because of predatory PBM business practices.  The COVID-19 pandemic has only exacerbated the financial challenges facing pharmacies across the country. And because the most vulnerable pharmacies are often in rural and under-served locations, the closure of such pharmacies could create serious obstacles for some patients seeking access to needed medical care.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on this 2nd day of June, 2020.

Debra L. Billingsley

# Debra L. Billingsley, J.D.

1104 NE 5th Terrace
Oklahoma City, Oklahoma 73017
Mobile: 405.659.4334
Email:dbillingsley5145@gmail.com

## PROFESSIONAL EXPERIENCE

**OKLAHOMA PHARMACISTS ASSOCIATION,** Edmond, Oklahoma  2015-present
**Executive Director**
- Advocate for over 400 independent retail pharmacies in Oklahoma at federal and state level.
- Passed progressive network inclusion legislation with PBMs and payors.
- Featured Editorials on Drug Importation and on PBM transparency.
- Serve on OK Health Care Authority Medical Advisory Committee over State Medicaid regulations and pharmacy reimbursement rates.
- Dynamic presentation before OK Legislative Bicameral Working Group on Medical Marijuana.
- Persuasive Response to Occupational Licensing Advisory Committee over the necessity of pharmacist licensure.
- Advocate  at federal level by submitting comments to U.S. Senate HELP Committee to lower drug costs.
- Updated Pharmacy Technician Manual for use in pharmacies.
- Serve as liaison for independent pharmacy on numerous regulatory task forces including but not limited to:  pharmacy technician education and requirements; automation; USP 800; USP 797; USP 795.
- Held successful Legislative Day at the Capitol with over 150 pharmacists and student interns present.
- Serve on RxSelect Oklahoma Community Pharmacy Enhanced Services Network grant committee.
- Served on Alliance for Patient Medication Safety Board of Directors,  a Patient Safety Organization.

**KANSAS BOARD OF PHARMACY,** Topeka, Kansas                  2003-2015
**Executive Secretary/Director**
- Licensed and Regulated all aspects of the drug delivery system including pharmacists, pharmacies, pharmacy technicians, distributors, manufacturers and retail dealers.
- Passed collaborative practice legislation in Kansas.
- Transitioned to paperless case management system software.
- Drafted and obtained federal grant to implement and operate the state's prescription drug monitoring program.
- Transitioned to Online license renewal with over 90% use the first year.
- Received KCHP Board of Directors Service Award in 2014.
- Supervised over 15 office staff, pharmacy inspectors and compliance officers.
- Reinstituted  Tripartite between Pharmacists Association and KU School of Pharmacy
- Received KPhA Champion of Pharmacy Award in 2011.

- Interacted with NABP by serving on Law Enforcement and Legislation Committee; NABP Resolutions Committee; NABP Standards for Use of PMP Data Committee; NABP PMPi Steering Committee.
- Served on University of Kansas School of Pharmacy Advisory Council
- Served on Multistate Pharmacy Jurisprudence Examination (MPJE) Review Committee with other states drafting and reviewing state specific questions for exam.

**RACING AND GAMING COMMISSION,** Topeka, Kansas
**General Counsel / Assistant Attorney General**
- Advised 5 member commission regarding their legal authority as it pertains to the Pari-mutuel Racing Act and Open Meetings Act
- Prosecuted and enforced criminal and civil statutes governing the areas of dishonest or disorderly gaming practices
- Litigated disputes between Indians Tribes and State Gaming Commission through arbitration hearings
- Drafted administrative rules and regulations and statutory language.
- Testify before the legislature regarding new and modified laws.
- Reviewed and drafted contracts regarding simulcasting and implementation of registration and licensure of all entities related to greyhound and horse racing.

**ALCOHOL BEVERAGE CONTROL,** Topeka, Kansas
**Assistant Attorney General**
- Prosecuted and enforced criminal and civil statutes governing areas of specific violations of the Liquor Control Act.
- Developed new civil statutes governing the area regarding sale of tobacco products to minors.
- Prosecuted and enforced civil statutes governing area of specific violations of the sale of tobacco and the  Charitable Gaming Act (Bingo).
- Drafted Administrative Rules and Regulations.
- Testified before the legislature regarding new and modified laws.

**KANSAS BOARD OF HEALING ARTS,** Topeka, Kansas
**Disciplinary Counsel**
- Resolved complaints from public against licensees (Doctor of Medicine and Surgery, Doctor of Osteopathic Medicine, Doctor of Chiropractic Medicine, Doctor of Podiatric Medicine, Occupational Therapist, Physician Assistant, Physical Therapist, Respiratory Therapist)
- Review new license applications and renewals.
- Prosecuted and enforced civil statutes governing areas of incompetent and unprofessional conduct pursuant to the Healing Arts Act.
- Attended peer review meetings and board meetings.

**DISTRICT ATTORNEY'S OFFICE,** Topeka, Kansas
**Shawnee County Assistant District Attorney**
- Prosecuted child in need or care and juvenile offender cases.
- General misdemeanor/minor felony cases.

## EDUCATION

**Juris Doctorate,** Washburn University School of Law, Topeka, Kansas
**Bachelor of Science,** Missouri State University, Springfield, Missouri