# Exhibit C

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF OKLAHOMA

| | |
|---|---|
| PHARMACEUTICAL CARE MANAGEMENT ASSOCIATION,<br><br>*Plaintiff,*<br><br>v.<br><br>GLEN MULREADY, *in his official capacity as* Insurance Commissioner of Oklahoma, and<br><br>OKLAHOMA INSURANCE DEPARTMENT,<br><br>*Defendants.* | No. CIV-19-977-J |

## DECLARATION OF RONALD WHITE, D.PH.

I, Ronald White, D.Ph., declare the following:

1. I serve as the Director of Pharmacy Benefit Manager (PBM) Regulatory Compliance at the Oklahoma Insurance Department, a newly created position I started this past April. Concurrently, I am also a staff pharmacist for Tribex Pharmacy in Sand Springs, which provides services for long-term care/nursing homes across Oklahoma.

2. For the Insurance Department, it is and will be my job to work with the Insurance Commissioner to facilitate the implementation of the Patient's Right to Pharmacy Choice Act (the "Act") and any other laws regulating PBMs. We will write rules, track the complaints we receive from consumers related to PBMs, select an advisory committee, etc.

3. In the past 40 years, I have worked in a variety of roles in the pharmaceutical industry, including as a pharmacist, a consultant and pharmacy director for health plans, a pharmacy auditor for a PBM, and more. With this diverse experience, I believe I can offer a unique and

hopefully helpful perspective in this dispute. I can also provide the Insurance Department's current numbers regarding complaints received relating to PBMs.

## Qualifications

4. In 1981, I obtained a Bachelor of Science degree in Pharmacy from Southwestern Oklahoma State University (SWOSU), focusing my studies on community (retail) and long-term care (nursing homes). Soon after, I began my career as a registered pharmacist, specializing in those areas. Later in my career, in 2005, the State Board of Pharmacy updated my licensure to a Doctor of Pharmacy (D.Ph.).

5. To begin my career, I worked for a number of years in community (retail) pharmacy. From 1981 to 1983 I managed Safeway Pharmacy in Sapulpa, Oklahoma. From 1983 to 1986 I managed Ross Drug in Broken Arrow, Oklahoma, and from 1986 to 1997 I owned and managed that same store. From 1997 through 1999 I managed Reasors Pharmacy in Broken Arrow. Finally, for the past two years, before taking my current position at the Insurance Department, I worked as a part-time fill-in pharmacist at various Oklahoma pharmacies.

6. I have also worked in long-term care pharmacy, serving residents of nursing homes across Northeastern Oklahoma as a consultant and dispensing pharmacist. From 1990 to 1996, I owned and managed Ross Prescription Services in Broken Arrow, Oklahoma, and from 2015 to 2018 I was the staff pharmacist for Omnicare Long-Term Care Pharmacy in Tulsa, Oklahoma. Since 2019 I have been a part-time staff pharmacist at Tribex Long-Term Care Pharmacy in Sand Springs, Oklahoma.

7. Furthermore, I have worked as a health plan pharmacy consultant. Specifically, from 1988 to 1996, I worked as a contract consultant pharmacist for Blue Cross Blue Shield of Oklahoma, in Tulsa. And for more or less that same time period, I worked as a contract consultant

2

pharmacist for BlueLincs HMO. In this role I developed pharmacy and therapeutics committees, negotiated manufacturer rebates, contracted with pharmacy networks, processed prescription claims, and developed an understanding of insured groups' needs for prescription cost control and a satisfied employee base.

8. I also spent nearly 15 years working for two health plans as the director of pharmacy: from 2002 to 2012 as the director of pharmacy for Blue Cross Blue Shield of Oklahoma and from 2012 to 2016 as the director of pharmacy for Global Health HMO. In conjunction with this role, I served health plans and a PBM as a member on several Pharmacy and Therapeutics Committees, which are committees that decide which drugs will appear on an organization's drug formulary. Specifically, from 2002 to 2012, I served on Blue Cross Blue Shield of Oklahoma's committee, from 2002 to 2012 I served on the committee of Prime Therapeutics, a PBM, and from 2012 through 2016 I served on the Global Health HMO committee.

9. Finally, from 1988 to 1990, I worked as a PBM Pharmacy Auditor for Pharmacy Gold, a PBM, in Minneapolis, Minnesota on a contract basis.

## A Complex and Changing Industry

10. In my nearly 40 years of experience, I have seen many changes in the pharmacy industry. For example, unlike in the distant past, today the pharmacy landscape is filled with formularies, specialty medications, mail-order and preferred pharmacy networks, and so on. Perhaps most remarkable, though, has been the growth of PBMs over the years.

11. PBMs perform several services in the pharmaceutical world. They process prescription drug claims, produce ID cards, build drug formularies, build pharmacy networks, negotiate with various parties, provide clinical services, provide utilization review, provide trend analysis, and market their abilities to health plans or self-insured employer groups. And even this

3

description is an over-simplification, as there are many sub-parts involved in each of these items.

12. To give an idea of how much the PBM practice has grown, when I started in community pharmacy in 1981, about 5% of a typical pharmacy's business was paid directly by a PBM or health plan. Forty years later, this figure has skyrocketed to 95% for many community pharmacies' payment for pharmaceuticals. Thus, the contractual relationship between a PBM and a pharmacy is critically important for community pharmacies. The growth of the PBM industry has also had a significant impact on the patient, in terms of what drugs are going to be available, where they will be available, and for what out of pocket cost.

13. Due to their size, PBMs have significant market power and contractual control. Individual pharmacies, on the other hand, do not have much ability to influence contracts. Most of the contracts they are offered by PBMs are so-called "take it or leave it" contracts.

14. PBMs make money in several different ways, and from many different sources. Take spread pricing, for instance: this happens when PBMs negotiate a contract with pharmacies at a discount, but do not pass the entire discount ("spread") along to the health plans or self-insured employers. Another way PBMs make money is through the formulary process, where drug manufacturers are willing to pay them administrative rebates to get their drugs on the PBM's formularies. Also, many PBMs own their own pharmacies, (mail order, Specialty, home IV and compounding pharmacies) which bring in income as well.

15. One concept that must be generally understood regarding PBMs is that of preferred networks. These are smaller retail pharmacy networks that PBMs utilize. A pharmacy that is part of a preferred network will receive a smaller co-pay from a patient, ideally in exchange for receiving more business overall.

16. I last worked for an insurance company around 5 years ago. Since then, PBMs have undergone significant changes and gained more market power. They have become more restrictive and ambiguous in how they contract.

17. For example, PBMs have begun making community pharmacies share in certain performance guarantee risks offered between the PBM and health plans or employer groups. During the prescription drug claim process PBMs do not generally identify the specific contract with which the consumer is participating. This leads to community pharmacies contracting with PBMs without knowing what precisely the risk entails, which has had a significant impact on pharmacies and their ability to plan. Moreover, many community pharmacies do not have actuaries to identify the risks commonly associated with health plans and PBMs. A community pharmacy may be a year into a contract, for example, when they receive a PBM demand for recoupment of certain monies the pharmacy had not foreseen. And they are not told how that recoupment amount was determined. Rather, the PBMs state the specific formula is proprietary and cannot be verified. If the pharmacy does not pay it, the recoupment amount may be taken out of their future reimbursements, whether the pharmacy approves or not.

## PBM Controversies

18. Several of the PBM practices and developments above have proven to be intensely controversial, especially when it comes to the treatment of pharmacies. These controversies have played out nationwide, not just in Oklahoma. I will mention a couple of those controversies here, although this is not intended to be comprehensive.

19. **Preferred Networks.**
    - Many of those controversies revolve around PBMs' preferred networks. Pharmacists are generally not told what the qualifications are for the preferred networks. This

produces intense frustration when pharmacies are willing to meet requirements, to obtain more customers, yet are shut out of the preferred networks without being told the requirements to participate. Rather than being given specifics, they are told that their inclusion just didn't "fit" due to the clients' network preferences.

- Over the years PBMs have become more and more sophisticated in driving patients into their preferred networks. Historically, PBMs would give patients an opt-out so they could stay with their local retail pharmacy. As time has gone on, and PBMs have increased the push into preferred or their own mail-order networks, and have started denying all patient requests to opt-out, making it mandatory for patients to come to PBM-affiliated pharmacies for insurance coverage of their prescriptions, even if the pharmacy is much further away.

20. **Contractual power.** As I mentioned above, PBMs generally have most of the negotiating and bargaining power when contracting, whereas pharmacies have very little. In all my years in the industry, I have never seen a contract reimbursement rate go up with a PBM/pharmacy contract. Each time the contract changes the PBMs are not increasing what they pay a pharmacy, they're decreasing it. Commonly the PBM does not pass along the full discount.

<u>The Patient's Right to Pharmacy Choice Act</u>

21. The Patient's Right to Pharmacy Choice Act attempts to level the playing field between PBMs and pharmacies with several different provisions relating to preferred pharmacies, contractual bargaining power, and other controversial PBM practices.

22. The Act requires significant changes from PBMs. We have 19 licensed PBMs in Oklahoma and most if not all 19 are currently operating in violation of this law. Indeed, it is a normal occurrence on some of these issues and provisions—it is the PBMs' standard of practice. It is

standard practice, for example, for PBMs to require at least some patients to use pharmacies that are owned by the PBMs.

23. Not implementing the Act, however, will allow community pharmacies and patients to continue to experience harm. During the past month alone, the Insurance Department has received over 100 complaints about violations of the new Act.

- Most of these complaints deal with PBMs requiring patients to use preferred pharmacy networks instead of their local retail pharmacy. What will typically happen is this: A patient will go to the doctor and obtain a drug prescription. That patient will be allowed to obtain a one to three month prescriptions of the maintenance medications from a local pharmacy, for the short-term. But after that, the patient will be required to go to a preferred pharmacy potentially further away or use a mail-order pharmacy as subsequent refills from the local pharmacy will not be permitted. The concern is it is taking away the consumers' freedom of choice.

- Other complaints involve pharmacies who are unable to gain access to the preferred networks or mail-order networks. They may want to be included, to help their business, but they are being excluded by the PBMs.

- Finally, we have received complaints about new contracts where PBMs are being more restrictive than they have ever been before, and less profitable to pharmacies.

24. At the same time, I cannot agree that implementing the Act will necessarily lead to the harm the PBMs claim in this lawsuit. The PBMs claim the law will "increase the cost of prescription drug coverage", which I find questionable. For example, I do not see how the provision requiring PBMs to accept a pharmacy into a preferred network if it meets the qualifications everyone else in that network is required to meet will negatively impact costs.

7

25. The PBMs claim that the Act will "leave health plans with fewer choices for designing that coverage." The Act does not ban any preferred networks or ban mail-order pharmacies, it states an individual's choice of in-network pharmacy may include a retail pharmacy or a mail-order pharmacy. A health insurer or PBM cannot restrict such choice and cannot incentivize using any discounts in cost-sharing or a reduction in copay or the number of copays to individuals to receive prescription drugs from an individual's choice of in-network pharmacy. Indeed, the Act explicitly states that health insurers or PBMs "shall not restrict" an individual's choice of a retail pharmacy or a mail-order pharmacy. As our complaints indicate, plenty of patients and pharmacies right now feel like they are not being given a choice in the matter.

26. The PBMs also claim that Oklahoma will be an aberration, nationally, if this law passes. Numerous states have enacted regulations on PBMs in recent years, and as far as I am aware most of the laws are being enforced. Regardless, every corporate entity, when they go state to state, they must comply with the laws of that state. The state-based regulation not a confounder in business – it is expected.

27. Finally, government employee benefits plans, church plans and many other health plans in Oklahoma that are sold are not impacted by ERISA rules or Medicare Part D. Thus, even if the Act is found to be preempted by ERISA and/or Medicare Part D, the Act will still have to be enforced for these non-ERISA and non-Medicare Part D plans, and PBMs will still have to change their practices.

28. I state under penalty of perjury that the foregoing is true and correct to the best of my knowledge. Executed this 2nd day of June, 2020 in Tulsa, Oklahoma.

*[signature: Ronald White, D.Ph.]*

Ronald White, D.Ph.